Rosa SANCHEZ, Appellant,

v.

TEXAS DEPARTMENT OF HUMAN RESOURCES, Appellee.

No. 1420.

Court of Civil Appeals of Texas, Corpus Christi.

April 26, 1979.

Gerald A. Garcia, Texas Rural Legal Aid, Inc., Harlingen, for appellant.

Thomas Sullivan, Asst. Dist. Atty., David C. Garza, Brownsville, for appellee.

## OPINION

NYE, Chief Justice.

Suit was brought by the Texas Department of Human Resources (State) to terminate the parent-child relationship between Rosa Sanchez, Appellant, the natural mother, and two of her eight minor children, Jose Antonio and Elojia. After a non-jury hearing, the trial judge entered a decree terminating Appellant's parental rights to Jose Antonio (born January 20, 1977) and Elojia (born January 18, 1976).

The State based its suit on Section 15.-02(1)(D) and (2) of the Texas Family Code Ann. (Supp.1979) which provides that:

"A petition requesting termination of the parent-child relationship with respect to a parent who is not the petitioner may be granted if the court finds that:

(1) the parent has:

\* \* \* \* \* \*

(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; . . .

\* \* \* \* \* \*

and . . .

(2) termination is in the best interest of the child."

Appellant answered by filing a plea in abatement, a general denial, numerous special exceptions and the following two "affirmative defenses": 1) that the Department had failed to meet its obligation to provide adequate child welfare and family services which would assist her in her child care duties; and 2) that she was of "limited intellectual and emotional capacity," lacked training necessary to improve her circumstances and that she had never "willfully denied her children the care that they need nor has she ever intentionally endangered their well-being." The trial judge, after hearing all the evidence, made the necessary findings to terminate the parent-child relationship.

Appellant, Rosa Sanchez, brings forward five points of error for our consideration. In points of error numbers one and two, Appellant brings forward "legal sufficiency" and "factual sufficiency" points by complaining that the trial court erred in denying her motion for judgment because there is "no evidence" and "insufficient evidence" to support a finding that Rosa Sanchez knowingly placed or *knowingly* allowed her children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children. Points of error three, four and five attack Sections 15.02(1)(D) and (2) and the trial court's actions on constitutional grounds.

In Texas, actions which break the ties between a parent and child "can never be justified without the most solid and substantial reasons." *State v. Deaton*, 93 Tex. 243, 54 S.W. 901 (1900). First, there is the strong presumption that a child's foremost interest is usually best served by keeping custody in and with the natural parents. This is based on a logical belief that the ties of the natural relationship of parent and child ordinarily bring about strong assurances and genuine efforts on the part of the custodians to provide the child with the best of care and most beneficial opportunities possible. Usually, the best atmosphere for mental, moral and emotional development of the child is with its natural parent. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. Sup.1976), citing *Mumma v. Aguirre*, 364 S.W.2d 220 (Tex.Sup.1963).

The standard of our review of legal and factual sufficiency points of error which attack the findings made by the trial judge or jury in an involuntary termination proceeding pursuant to the Texas Family Code is governed by the same general rules applicable to other civil cases. See e. g., *Woodard v. Texas Dept. of Human Resources*, 573 S.W.2d 596 (Tex.Civ.App.—Amarillo 1978, writ ref'd n. r. e); *In re E. S. M.*, 550 S.W.2d 749, 752 (Tex.Civ.App.—Houston [1st Dist.] 1977, writ ref'd n. r. e.). Thus, in deciding the "legal sufficiency" point, we review the evidence only in the light most favorable to support the trial court's findings, and in deciding the "factual sufficiency" point, we must consider all of the evidence. See *Garza v. Alviar*, 395 S.W.2d 821 (Tex.Sup.1965); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (Tex. Sup.1951); *In re E. S. M.*, 550 S.W.2d 749 (Tex.Civ.App.—Houston [1st Dist.] 1977, writ ref'd n. r. e.).

Our review of the evidence herein is directed toward the legal as well as factual sufficiency points of error. Ezequiel Cisneros, a Cameron County welfare case worker, testified that he was assigned to assist Rosa Sanchez and her children in September, 1976. During his initial visit to the home,

Cisneros discovered that four adult women and approximately twenty-five children were living in one small three-room home containing one bathroom. In addition to Rosa Sanchez and her eight children, Rosa's mother, three sisters, and approximately seventeen other children occupied the cramped living quarters. Cisneros said he initially was unable to determine which children belonged to Appellant Sanchez. Upon subsequent visits, he testified that he began to identify the various members of each family. He observed that all of the children were dirty, shabbily dressed, and suffered from old scars, scabs and sores indicating that the children received inadequate medical attention.

The case worker testified that as he began to identify which children belonged to Appellant Sanchez, he observed that her children "were always the ones that were hungry; the ones that were never around; or the ones that were out in the streets." He testified to the effect that the home was always very dirty, cluttered, and had decaying food scattered throughout. He stated that he attempted at the outset to concentrate upon improving the environmental and medical situation of Appellant's children. He referred the Appellant to a variety of community facilities where public assistance and instructions were available. These included the Texas Employment Commission, the Manpower C.E.T.A. program, vocational rehabilitation (through the Department of Public Welfare), Parents Anonymous; family planning, financial assistance, transportation services, legal aid, food stamps, public housing for supplemental rent and a variety of home management instructions, including the homemaker program available through the Texas Department of Human Resources. The case worker, Cisneros, visited the home where Appellant and her children lived approximately two to three times per week throughout the time from his assignment to the case until the filing of this termination proceeding.

The evidence showed that the Appellant had never been married. There was no evidence as to who the father(s) of all of the children were. Cisneros testified that after Jose's birth, he observed that the little boy always seemed to be asleep when he visited the house. During a visit in April of 1977, when Jose was approximately three months old, Cisneros paid particular attention to him. He observed that, although Jose was awake, he was lying in his crib in an extremely listless state. At that time, Cisneros observed that the baby had "real skinny arms and real skinny legs and a large protruding belly." Cisneros recommended to the Appellant that she take Jose to the doctor. Cisneros testified that when he returned to the home, a few days later, he noticed that Jose's condition was the same. Appellant told him she had taken Jose to the doctor and that he had done nothing because Jose was "all right."

On May 18, 1977, approximately three weeks later, when Cisneros attempted to visit the Appellant's home, he was refused entry by Appellant's mother. Later, he returned and talked to Appellant who told him that her doctor had ordered tests and had given her prescriptions for Jose but that she had not gone back for the results nor had she purchased the prescriptions. Cisneros testified that Appellant indicated that she was dissatisfied and wished to change doctors. Cisneros then made an appointment for her to see a Dr. Bromiley the following day. He requested Appellant to tell him if she needed a ride to the appointment. Four days later (May 23), Jose was finally taken to the doctor after Cisneros checked back with appellant and found that she had failed to keep her initial appointment.

Case worker Cisneros testified that the little girl, Elojia, was almost always in her crib even though she was over sixteen months old at the time. The baby girl also appeared to be extremely undernourished and very listless. Cisneros testified to the effect that, although her condition did not appear to be as serious as that of the younger baby boy, she appeared to be undernourished and recommended that Appellant take her to the doctor as well.

Dr. Abele Bromiley, a pediatrician who had several years experience with malnutrition in Africa, was the next witness. She testified that she had seen Jose and Elojia in her office on May 23, 1977. Dr. Bromiley described Jose (the baby boy's) condition as being in a state of moderately severe malnutrition. Elojia (the baby girl) was described as being extremely underweight, lethargic and unable to walk even though, at the time of this initial visit, she was approximately eighteen months old. Neither Jose or Elojia responded to outside stimulus. Dr. Bromiley testified that Appellant had been feeding the baby only milk from a bottle three times a day, which, for a child of that age, was not sufficient. She testified that she spent an unusually lengthy time explaining and writing out a list of all the solid foods she thought the children should have. In addition, Dr. Bromiley gave Appellant two cases of food stuffs and arranged to have a follow-up appointment with Jose the following Monday.

On Monday when Appellant returned with Jose for the follow-up appointment, Dr. Bromiley testified that Appellant had not fed the children any of the solids that she had recommended and failed to explain why. In response to Dr. Bromiley's question of "well, why didn't you give it," Appellant's response was, "well, I didn't." Dr. Bromiley testified that Appellant told her that there was nothing wrong with the children. It was the case worker who had insisted that they be checked by a doctor.

Dr. Bromiley explained that Jose was hospitalized on June 6, 1977, and Elojia was hospitalized on June 8, for the purpose of determining whether or not the children were malnourished due to low caloric intake or whether the malnutrition was a side-effect of some other disease. Dr. Bromiley stated that it was obvious from the children's responses observed in the hospital that they had not learned to take food from a spoon. During the time of their hospitalization, both children were placed upon a high caloric and protein intake and each gained weight rapidly. The children's development during their hospitalization was dramatic. They began to respond and form attachments to people. Within a few weeks, the children's height-weight ratio was within normal tolerances, indicating, according to the doctor, that the cause of their malnutrition was not some side-effect of another disease, but rather, the effect of inadequate feeding while in the custody and care of their mother.

The children were later released from the hospital and were placed in a foster home. On September 15, 1977, they were returned to their mother under an agreed court order. Dr. Bromiley testified that she again saw the children near the end of September or the beginning of October of 1977. On October 13, 1977, both children were again admitted to the hospital because they were suffering from diarrhea, a cold, and they were not gaining or growing as they should. At the time they were admitted into the hospital the second time (in October), they were both again suffering from a state of malnutrition. It was shortly thereafter that these proceedings were instituted to terminate the parent-child relationship between Appellant and her two children, Jose and Elojia.

The record before us shows that during the period of time from June until September 15, 1977, the Appellant received special instructions concerning home care and nutrition from the case worker, Mr. Cisneros, Miss Maria de los Santos, a homemaker for the Cameron County Child Welfare Department, Lucinda M. Flores, a registered dietician with the Brownsville Medical Center, and Dr. Bromiley. Cisneros testified that he continued to visit Appellant in her home during the time period the children were first hospitalized. In spite of the detailed instructions she received, Cisneros testified that Mrs. Sanchez' home continued to be filthy, food was allowed to spoil, and the other children remained dirty and unkept. Cisneros visited Appellant's home on September 16, the day after Jose and Elojia were returned to Appellant's custody, and brought three cans of food, some canned vegetables and one can of meat. He testified that when he returned the next day, the two cans of vegetables were still full

and the can of meat was gone. Cisneros investigated the bottle which was lying in the crib with baby Jose. He testified that he opened it and then described an overpowering rotten smell. In response to his inquiries, the Appellant admitted that she had fed the child the can of meat the previous day by placing the meat in the baby bottle and pouring milk over it. This combination had spoiled and had not been removed from the crib.

Mike de Sozarraz, a psychologist for Tropical Texas M.H.M.R. in Edinburg, Texas, testified that the Appellant had been referred to him by the Brownsville Child Welfare Department for psychological evaluation. He was requested to test her for her abilities to nurture her children and find out how much she could retain information. De Sozarraz testified that the Appellant had grown up emotionally deprived herself, and that it was typical of such a "neglect syndrome" that adults who, when as children, had not received enough warmth emotionally were unable to provide care for other people, including their own children. He further testified that she had an inability to think in abstract terms. He described her prognosis for learning to care for her children as poor. He testified that Appellant was within the normal range of intelligence, but she lacked understanding of her children's physical condition. He testified that she seemingly considered them to be only underweight and not ill.

Miss de los Santos, a homemaking consultant with Cameron County, was assigned to the case by Cisneros in July, 1977, for the purpose of providing Appellant with training sessions on child care. After the children were returned to Appellant's care, de los Santos visited the home almost daily from September 26 on. She testified that the Appellant made no effort to clean the house, to feed or bathe the children. She stated that the Appellant refused to take her instructions and that she only made "fun of me all the time I was there." De los Santos' testimony included a detailed description of the special training program the Welfare Department provided for Appellant and Appellant's apparent indiffer-ence to the sessions as well as her indifference to the children's care when they were returned to her.

By October 13, 1977, the children's conditions had deteriorated seriously enough to warrant hospitalization and both were admitted to the hospital in a state of malnutrition again. The children were finally taken by the Texas Department of Human Resources on October 31, 1977. The record shows that the Appellant was informed of her visitation rights while the children were in the hands of the Department of Human Resources, but she made no effort to visit the children until advised that she should do so by her attorney, nearly five months after the date the children were taken from her.

Appellant testified in her own behalf. At the time of trial, she stated that she had moved to another home and now lived with one of her sisters and her sister's seven children. She testified that she cared about her children and stated that she had never done anything to purposely hurt them. She further testified that she worked well with and cooperated with her other case workers, Debbie Guynn and Frank DeGeer, but that she felt "confused and uncomfortable" with Mr. Cisneros because she felt he was trying to take away her children. Concerning the youngest two children's state of health, Appellant stated on cross-examination that, in May, before the children went to the hospital, she did not believe that they were sick. She thought that they were all right and thought she was feeding them correctly. She considered the baby boy's condition to be caused from diarrhea and teething problems. She admitted, in effect, that she knew that rotten food was unhealthy. She stated that she would think that anyone who gave her rotten food was trying to hurt her. She stated that she resented anyone interfering with her life and telling her how to run her home.

█ The Appellant contends that the evidence introduced at the hearing does not justify termination of her parental rights because the evidence showed only that her failure to provide a desirable degree of care

and support for her children was due solely to her lack of intelligence, training and misfortune, citing the dicta in *D. F. v. State*, 525 S.W.2d 933, 940 (Tex.Civ.App.— Houston [1st Dist.] 1975, no writ). We agree that termination of the parent-child relationship might not be warranted in instances where the parent, through lack of intelligence or training, illness or misfortune, is unable to provide a desirable degree of physical care and support for his or her children. Here there is substantial evidence which indicates that the Appellant's inability to care for her children was not due to those factors alone. While there is some evidence which suggests that Appellant was unable to follow even the most basic child care instructions, there is ample evidence that the Appellant was indifferent to her children's physical condition and uncooperative with the workers who attempted to assist her in providing proper care. The children were so malnourished that they required hospitalization. The children were infrequently fed and the food offered to them was often rotten or spoiled. The Appellant admitted, in effect: that she knew rotten food was harmful; that she permitted such food to be available to the babies; and that she resented interference with the manner in which she raised her children. She told the trial judge that "the first time, I didn't want to take care of them."

There is ample evidence in the record, including Appellant's own testimony, from which the trial judge could reasonably conclude that Appellant knowingly placed or allowed Jose and Elojia to remain in an environment which endangered their physical or emotional well-being. The trial judge from his vantage point, had the opportunity to observe the Appellant herself and all of the other witnesses and could judge their demeanor throughout the course of this trial. We have, with this in mind, reviewed the entire record, first under the rules concerning legal insufficiency (first point of error) and then by the rules of factual sufficiency (second point) and conclude thereby that the evidence is "solid" and that the trial court had "substantial reasons" for terminating the "ties" between this parent and these children.

We therefore hold that there is ample evidence of probative force in this record that the Appellant knowingly allowed these two children to remain in a state of condition and in surroundings which endangered their physical as well as their emotional well-being. The trial judge was justified, from the evidence in the record, in deciding that it would be in the best interest of the children that such termination be ordered. Appellant's points of error number one and number two are overruled.

In point of error five, Appellant attacks Section 15.02(1)(D) and (2) of the Texas Family Code as being void for vagueness and violative of the due process of law. As a general rule, there is a presumption that the Legislature has not acted unreasonably or arbitrarily in enacting its legislation. The burden is on the one who challenges an act to establish its unconstitutionality. *Robinson v. Hill*, 507 S.W.2d 521 (Tex.Sup.1974); *Smith v. Craddick*, 471 S.W.2d 375 (Tex.Sup.1971). The United States Supreme Court in *Grayned v. City of Rockford*, 408 U.S. 104, 108–109, 92 S.Ct. 2294, 2298–2299, 33 L.Ed.2d 222 (Tex.Sup. 1972), summarized and identified several dangers inherent in vague laws:

"Vague law offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. [Footnote omitted.] Second, if arbitrary or discriminatory enforcement is to be prevented, laws must provide explicit standards to those who apply them. [Footnote omitted.] A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attended dangers of arbitrary and discriminatory application." [Footnote omitted.]

The language of a statute cannot be so broad and vague that persons "of common

intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Construction Co.*, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926). See *Texas Liquor Control Board v. Attic Club, Inc.*, 457 S.W.2d 41, 45 (Tex.Sup.1970); *Lone Star Gas Co. v. Kelly*, 165 S.W.2d 446 (Tex.Sup.1942).

■ In considering the provisions of Section 15.02(1)(D) pursuant to these standards, we find that this section is not unconstitutionally vague. In accordance with the express provisions of Section 15.-01(1)(D), not only must the evidence show that the parent has placed or allowed the child to remain in conditions or surroundings which *endanger the physical or emotional well-being of the child*, but also, the evidence must show that the parent *knowingly placed or knowingly allowed* the child to remain in such conditions or surroundings. Thus, the legislative standards which justify termination of the parent-child relationship pursuant to this section, require knowledge on the part of the parent that the child's conditions or surroundings seriously endanger the child's physical or emotional welfare. We believe that our Legislature would have had extreme difficulty in being more specific in this instance. See *State v. McMaster*, 259 Or. 291, 486 P.2d 567, 570 (1971).

In support of Appellant's contention that the sections in question are void for vagueness and thus, violate her procedural due process rights, Appellant relies primarily upon the case of *Alsager v. District Court of Polk County, Iowa*, 406 F.Supp. 10 (S.D. Ia.1975), aff'd 545 F.2d 1137 (8th Cir. 1976). In that case, the Federal District Court ruled an Iowa termination statute to be unconstitutional on several grounds. This Iowa case is not persuasive authority for the precise constitutional issue before us. We initially observe that the Iowa statute in question did not require any of the prohibited acts to be committed "knowingly." In addition, a careful reading of the opinion of the Eighth Circuit panel in affirming the case reveals that the appeals court expressly declined to affirm the district court's opinion on the basis of the "vagueness and overbreadth attacks upon the facial validity" of the statute. See *Alsager v. District Court of Polk County, Iowa*, 545 F.2d 1137 (8th Cir. 1976). The result we reach in this case is consistent with the results reached by several other jurisdictions considering constitutional "void for vagueness" attacks upon similar termination statutes. See e. g.,*In re D. T.*, 237 N.W.2d 166 (So.Dak.Sup. 1975); *State v. McMaster*, 259 Or. 291, 486 P.2d 567 (1971); *In re Cager*, 251 Md. 473, 248 A.2d 384 (1968).

This precise contention as to Section 15.-02(2) has previously been considered and rejected by another Texas appellate court. See *D. F. v. State of Texas*, 525 S.W.2d 933 (Tex.Civ.App.—Houston [1st Dist.] 1975, no writ). In addition, similar attacks against Sections 15.02(1)(E) and (F) have also been rejected. See *Crawford v. Crawford*, 569 S.W. 505, 508 (Tex.Civ.App.—San Antonio 1978, no writ); *McGowan v. State*, 558 S.W.2d 561, 566 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ ref'd n. r. e.); *Lane v. Jefferson County Child Welfare Unit*, 564 S.W.2d 130, 133 (Tex.Civ.App.—Beaumont 1978, writ ref'd n. r. e.). We find there is no merit to Appellant's attack upon the constitutionality of Tex. Family Code Ann. § 15.02(1)(D) (Supp.1979). Appellant's point of error number five is overruled.

■ In points of error numbers three and four, Appellant complains that: 1) the State failed to show a compelling State interest in the termination of her parental rights; and 2) the State failed to show that termination of the parental rights was the least drastic alternative for fulfilling the State's interest to protect the children and strengthen the family. The major contention under these points of error is that the State failed to exhibit the threshold harm necessary to give the State a compelling interest sufficient to justify permanent termination of the parent-child relationships, and thus, under the evidence of this case, the statutes as applied violated her constitutional rights. Appellant also argues, in effect, that the State failed to prove that it pursued "less drastic" alternatives, such as

"counseling, therapy, day care, nutrition advice and temporary foster care," prior to resorting to termination. The record does not support these contentions.

Our Texas Supreme Court has recognized that the natural right which exists between parents and their children is one of constitutional dimensions. See *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. Sup.1976), citing *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Armstrong v. Manzo*, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Appellant concedes that the State seeks to further a legitimate State interest when it sets out to protect the welfare of its child citizens. Indeed, as the United States Supreme Court has recognized, the State has the "right" and the "duty" to protect minor children. *Stanley v. Illinois*, 405 U.S. 645, 649, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); see also *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

The record in this case indicates that the State attempted to assist the Appellant by providing access to every possible resource and service organization available in order to provide services, assistance, instruction and monitoring. Appellant's points of error three and four are overruled.

The judgment of the trial court is AFFIRMED.