**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00083-CV**
_____

**IN THE INTEREST OF D.S.D.D.**

On Appeal from the 1st District Court
Jasper County, Texas
Trial Cause No. 36620

**MEMORANDUM OPINION**

This is an appeal from an order terminating the parental rights of D.S. (Mother) to D.S.D.D. (Daniel).[1,2] In two issues, Mother argues that the evidence was legally and factually insufficient for the trial court to find Mother committed a prohibited act under section 161.001(b)(1)(D) of the Texas Family Code and

---

[1] We identify minors in appeals in parental-rights termination cases by using an alias to protect the minor's identity and all members of the child's family. *See* Tex. R. App. P. 9.8(a), (b).

[2] The trial court terminated the alleged Father's rights; however, Father does not appeal the termination.

terminate the parent-child relationship or to show that the termination was in Daniel's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), 161.001(b)(2) (West 2019). We affirm the judgment of the trial court.

## Background

Testimony at trial established that Mother and Daniel moved to Texas from Mother's hometown of Omaha, Nebraska, when Daniel was three years old. The Department of Family and Protective Services (the Department) became involved after it received a call from Mother, who "appeared hysterical" and stated that she lived in a hotel room in Jasper, Texas, with her young child. Mother reported that she and Daniel were homeless, and they both had very little to eat for the past two days. According to Department Investigator Kecia Davis, a police officer performed a welfare check on Mother and Daniel the same day.

The following day, a police officer contacted the Department with another report that Mother "fainted -- or had collapsed" while at a grocery store with Daniel. Davis went to the grocery store and discovered that Daniel was hungry, had on a soiled diaper, and "had no clothes . . . other than . . . a pair of shoes and shorts." Davis testified that no one outside the Department could take possession of Daniel at that time, so the Department removed Daniel and placed him in foster care. Davis testified that when she spoke to Mother later that day, Mother was very upset and

became hysterical. Davis expressed concern over the lack of food for the child in the hotel room where Mother and Daniel stayed. Law enforcement gave Mother food vouchers the day before, but Davis was worried that Mother did not have anything to feed Daniel when he became hungry again later.

Davis testified that the Department previously investigated Mother for neglectful supervision of Daniel. According to Davis, Mother appeared to have mental problems and exhibited other concerning behaviors while traveling around with her three-year-old child. The Department administratively closed its prior case, because Mother was living at a women's shelter and had the necessities to care for herself and her child.

Tiffany Porter testified that she had been the caseworker on Mother's case for more than a year at the time of trial and stated that she spoke to Mother "at least three or four times a week." While Porter was of the opinion that Mother is "a nice person" and tries to be compliant with the Department, she was concerned that Mother was not employed or financially independent, could not provide a stable home environment for Daniel, and had difficulty prioritizing the safety and welfare of Daniel. Porter explained that during the pendency of the case, Mother moved nine times, was homeless at least twice, and had lived in a shelter and at a hotel. According to Porter, after the Department removed Daniel, Mother told Porter via

text message that she had decided to move back to Omaha, Nebraska, because "her family was there," and "she could get more help…finding a job." This greatly troubled Porter because Daniel was in foster care in Texas, and Mother would be unable to have physical visits with him. The move to Nebraska demonstrated Mother's irrational decision-making in that Mother did not clearly consider the effects her choices had on Daniel. Mother failed to prioritize Daniel's needs over her own. Porter testified that while Mother substantially completed her service plan, including parenting classes, Mother did not effectively demonstrate her parenting skills because she resided in another state and could not exercise her physical visitations with Daniel anymore.

Porter testified that Mother's service plan required her to submit to a psychological examination. The Department admitted a copy of the psychological examination report into evidence. The report showed that Mother had borderline intellectual functioning. Porter testified that although the report noted that Mother is nice and tried to comply with the Department, the psychologist had "significant concerns" about her reunification with Daniel. The report noted that

> mother appears to have little capacity and almost no resources to address problem solving/decision making for herself and her child[.] . . . [Mother] takes little responsibility for her child's emotional and psychological state, and believes she is more of a victim in the situation. Her low cognition also limits her ability to appreciate all aspects of

4

> appropriate childrearing, sustaining critical communal relationships, and having a stable, functional lifestyle.

The psychologist also found that Mother failed to adequately meet the medical, emotional, or welfare needs of her child. The report recommended that Daniel remain in foster care, because Mother is "unable to show that she is a socially competent, financially independent, mature adult who is able to prioritize the welfare and safety of her child in all areas long-term." Porter stated that the report caused her concern for the safety of Daniel because "after the interview with a licensed physician, [Mother] wasn't able to show to [the licensed physician] that she had the mental capacity or [was] financially able to care [for] a child unless she had another adult supervising her."

Porter testified that although Mother cooperated with the Department, there were several unexplained inconsistencies in the statements or actions of Mother that worried the Department. Porter testified that Mother told her that she worked at Wal-Mart in Nebraska, but they cut her hours due to the government shutdown. When Porter questioned Mother about why her hours would be cut due to the government shutdown, Mother's only explanation was that Nebraska is different than Texas and the government shutdown influenced her hours.

In another incident, Porter stated that she received pictures from an unknown source, showing Mother "laying in a bathtub with a knife to her throat with what

5

appeared to be . . . maybe fake blood[.]" When Porter questioned Mother about the photos, Mother discounted the incident and told Porter that she posted the images on Facebook to let people know about bullying and the harm it could cause. Porter had to explain to Mother that her social media posts could cause Daniel hurt and concern in the future. Porter testified that Mother's actions again demonstrated Mother's failure to put Daniel's needs above her own.

Porter testified that due to the pictures Mother posted on social media, she requested Mother submit to another mental health assessment. The day of the appointment, Porter received a message that Mother had a car accident before her appointment, and Porter did not speak to Mother for thirteen days thereafter. When questioned about the Department's inability to reach her, Mother told Porter that she was hospitalized for ten days and unable to contact the Department because she was unconscious. When Porter asked Mother to submit documentation to verify the accident and her subsequent hospital stay, Porter claimed she threw out all documentation regarding the accident and hospital stay while cleaning. When pressed for further information, the phone disconnected, and Porter could not contact Mother until Mother later called to talk to Daniel.

Porter stated that Mother's lack of stability always concerned her. Porter testified that she did not believe Mother had the knowledge or skills necessary to

6

care for Daniel and feared for his safety if returned to her care. Porter opined that Mother's "transient lifestyle" was unsafe for Daniel, and that her surroundings and lifestyle, both before the Department intervened and during the pendency of the case, showed that she would continue to endanger Daniel. Porter stated that Daniel thrived in foster care, and his foster parents loved and cared for him, provided for his needs, and wanted to adopt him.

Mildred Adams testified as the guardian ad litem in this case. She opined that Daniel should not be returned to his Mother's care. According to Adams, Mother undoubtedly loves Daniel, but she believed that Mother was mentally unstable and demonstrated an inability to properly provide for her son. Adams stated that Mother was incapable of caring for her son and expressed concern for the child's safety if returned to his Mother. According to Adams, Daniel was in a safe, appropriate, and happy home with his foster parents, and the foster parents could provide for all his needs if they adopted him.

Mother testified at trial by video conference from her apartment in Nebraska. Mother admitted that she "made a huge mistake as a mother, but I was on my way of (sic) fixing it[,] so I could give my son a better life." Mother denied she had a transient lifestyle when the Department removed Daniel from her possession but admitted that she moved several times with Daniel when he was very young,

7

including to Arizona, Nevada, Nebraska, and Texas. She testified that she moved to Texas because she wanted a "different lifestyle" and "to get away from my mother and try to start over with life, but it did not go as I planned." Mother admitted that she arrived in Texas without a job and lived with a friend's elderly grandmother until she decided to leave the grandmother's house "to get my own stuff." Mother stated that while in Texas with Daniel, she lived in "Silsbee, Beaumont, Houston, and Jasper," and sometimes in homeless shelters. According to Mother, it became clear that "things in Texas weren't going right for me with my child." Mother stated that she was in Texas for less than one month when the Department removed Daniel from her possession. She testified that she lived in a hotel room in Jasper for a few days before calling 911 because she did not have "any resources" to feed her child. Mother stated the police tried to help her get a ticket "back home" to Nebraska.

Mother claimed that the heat caused her to pass out when they removed Daniel from her care at the grocery store. Mother regretted that she put her child in that situation but told the trial court it only lasted a short while. Mother stated that if she could not provide for her son, she had a safety net of relatives in Nebraska, including her father and sister, who could provide support and care for Daniel. During cross examination, Mother admitted that when she moved to Texas with Daniel, her father was incarcerated for selling drugs, which she attempted to justify by claiming he did

so "to hold his family together." Because of his incarceration, her father was not able to provide any support for her and Daniel.

To explain the photos she posted on social media depicting herself covered in fake blood, Mother stated that she had a history of being bullied, and she posted the pictures to show that "you have to stop bullying." She wanted to reach out to "somebody that's on the edge or the verge . . . [to] help them out because your voice can be the voice that saves[.]" She admitted that she only took down the post after her father told her to take it down and "to make better decisions."

Mother testified that since returning to Nebraska, she has remained employed and leased an apartment. She received food stamps and paid her bills. She stated that Daniel would "have a place to call home . . . [and] everything he needs if he was to get back in my custody." During the video conference call, when questioned about why she was wearing a coat inside her apartment, Mother testified that she currently did not have heat in her apartment but that she had submitted a repair request.

After the bench trial, the trial court terminated Mother's parent-child relationship with Daniel pursuant to section 161.001(b)(1)(D) and further found that such termination was in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D). Mother timely appealed.

**Standard of Review**

In parental rights termination cases, the standard of proof required at trial is clear and convincing evidence. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014) (citing *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980)). The no-evidence standard typically employed in a legal sufficiency review does not adequately protect the parent's constitutional interests in a termination case. *In re M.N.G.*, 147 S.W.3d 521, 535 (Tex. App.—Fort Worth 2004, pet. denied) (citing *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002)). Legal sufficiency in a parental termination case is not satisfied by the traditional standard of anything more than a scintilla of evidence. *In re J.F.C.*, 96 S.W.3d at 264–65. A legal sufficiency review in parental termination cases requires us to determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction" that the grounds for termination were proven. *Id.* at 265–66. We examine all of the evidence in the light most favorable to the finding to ascertain whether a reasonable trier of fact could have formed a firm belief its finding was true. *See id.* at 266; *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We assume disputed facts were resolved by the factfinder in favor of its finding and disregard evidence a reasonable factfinder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266. If, after review, we determine no reasonable factfinder could form a firm belief or conviction that the matter that must be proven

is true, we must conclude the evidence is legally insufficient. *In re J.O.A.*, 283 S.W.3d at 344–45; *In re J.F.C.*, 96 S.W.3d at 266.

In a factual sufficiency review, "a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. In examining factual sufficiency, we will consider whether disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *Id*. The evidence is factually insufficient, if, "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction[.]" *Id*.

## Termination under 161.001(b)(1)(D)

In her first issue, Mother argues that the evidence was not legally or factually sufficient to support the trial court's judgment to terminate the parent-child relationship under section 161.001(b)(1)(D). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D). To involuntarily terminate a parent's rights, a trial court is required to make two findings. *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). First, a parent must have committed a prohibited act under section 161.001 of the Texas Family Code, and second, termination of the parent's rights must be in the child's best interest. *Id*.; *see also* Tex. Fam. Code Ann. § 161.001(b)(1), (2) (listing

11

necessary requirements to terminate parent's parental rights). To support a termination, only one predicate finding under section 161.001(b) is necessary when there is also a finding by the trial court that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (citations omitted).

To terminate based on section 161.001(b)(1)(D), the Department must show that Mother "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of the child." *Id.* "'To endanger' means to expose a child to loss or injury or to jeopardize a child's emotional or physical health." *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (citing *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied.)). Endangerment under subsection D may be established by evidence regarding the child's environment. *In re A.A.L.A.*, No. 14-15-00265-CV, 2015 WL 5437100, at *5 (Tex. App.—Houston [14th Dist.] Sept. 15, 2015, no pet.) (mem. op.); *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). "Parental rights may be terminated under subsection D based on a single act or omission." *In re J.E.M.M.*, 532 S.W.3d 874, 881 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (citation omitted). We review the parent's conduct before the child was removed by

the Department. *See In re J.R.*, 171 S.W.3d 558, 570 (Tex. App.—Houston [14th Dist.] 2005, no pet.). "[S]ubsection D is not a basis for termination of parental rights if the parent was unaware of the endangering environment." *In re J.E.M.M.,* 532 S.W.3d at 881 (internal citations omitted). Therefore, we must determine if there was evidence of the endangerment and if Mother was aware of the endangering environment. *See id.*

In this case, testimony at trial established that Mother lived in at least four different states, in hotels, women's shelters, and was sometimes homeless, all while Daniel was younger than three years old. When Mother decided to move to Texas, she moved without a job or a permanent residence and lived a short while at the house of a friend's elderly relative.[3] After Mother left that residence, she proceeded to move with her child to various cities and homeless shelters around Texas and continued to be unemployed. During this time, testimony established that the Department investigated Mother due to her mental health and housing instability. Ultimately, Mother ended up in a hotel in Jasper with very little food for her child, relying on food vouchers provided by the police after a welfare call. Department caseworker Davis testified that when they removed Daniel, Mother's inability to

---

[3] Evidence indicated she met the friend through social media.

13

feed her child without vouchers and failure to anticipate the child's future needs "concerned" her.

Department caseworker Porter stated that while Mother complied with the Department and its service plan, her erratic behavior and instability would continue to endanger Daniel if they returned him to her care. Porter testified that Mother demonstrated a refusal to put Daniel's needs above her own.

Mother admitted at trial that she moved several times with Daniel but denied having a "transient lifestyle." She simply believed that she took vacations, although evidence at trial established that she lived in the places long enough to obtain identification cards. Mother offered excuses for her decision to move to Texas with Daniel without a job or permanent residence. Mother admitted that she made a poor decision regarding her child's health while in the Jasper hotel room. She attempted to explain that it was only temporary, despite her inability to buy food or afford stable housing and no real plan to do so. *See In re N.E.S.*, No. 10-09-00282-CV, 2010 WL 3911418, at \*1–2 (Tex. App.—Waco Oct. 6, 2010, no pet.) (mem. op.) (holding a termination under subsection D was legally and factually sufficient because evidence showed that Mother "created 'an unstable situation'…and placed [the child] 'in an unsafe condition'" when she "lived in at least eight different locations from the time of his birth until he was removed from her care when he was

14

almost ten months old"). Although Mother testified that at the time of trial she had housing, a job, and stable family support, "even strong evidence of improvement cannot conclusively negate past history." *See In re P.R.W.*, 493 S.W.3d 738, 744 (Tex. App.—Corpus Christi 2016, no pet.) (mem. op.) (citations omitted). The evidence was legally and factually sufficient to show that Mother "knowingly placed or knowingly allowed" Daniel to remain in an environment that would endanger his "physical or emotional well-being." *See* Tex. Fam. Code. Ann. § 161.001(b)(1)(D). Therefore, we hold that there was clear and convincing evidence to terminate her parent-child relationship under 161.001(b)(1)(D). We overrule Mother's first issue.

**Best Interest of the Child**

In her second issue, Mother argues that the Department failed to present "legally and factually sufficient evidence" that termination of the parent-child relationship was in Daniel's best interest. "[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *see also* Tex. Fam. Code Ann. § 153.131(b) (West 2014). In reviewing whether termination is in a child's best interest, we consider a non-exhaustive list of factors: (1) desires of the child; (2) emotional and physical needs of the child now and in the future; (3) emotional and physical danger to the child now and in the future; (4) parental abilities of the individuals seeking custody;

15

(5) programs available to assist these individuals to promote the best interest of the child; (6) plans for the child by these individuals or by the agency seeking custody; (7) stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). "[T]he prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest." *In re F.A.B.*, No. 05-14-01277-CV, 2015 WL 631165, at *3 (Tex. App.—Dallas 2015, pet. denied) (mem. op.) (citing Tex. Fam. Code Ann. § 263.307(a) (West 2014)).

The list is not exhaustive, but simply indicates considerations that have been or could be pertinent. *Holley,* 544 S.W.2d at 372. However, the best-interest determination neither requires proof of any unique set of factors nor limits proof to any specific factors. *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) (citing *Holley*, 544 S.W.2d at 371–72). There is no requirement that the party seeking termination prove all nine factors. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Undisputed evidence relating to one single factor may be adequate in a particular situation to support a finding that termination is in the best interest of the child. *Yonko v. Dep't of Family & Protective Servs.*, 196 S.W.3d 236, 243 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Evidence supporting the termination of

parental rights is also probative of best interest. *In re C.H.*, 89 S.W.3d at 28. "A parent's inability to provide adequate care for her children, unstable lifestyle, lack of a home and income, lack of parenting skills, and poor judgment may be considered when looking at the [child's] best interest." *In re J.D.*, 436 S.W.3d 105, 119 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *In re C.A.J.*, 122 S.W.3d at 893); *see also Garza v. Tex. Dep't of Human Servs.*, 794 S.W.2d 521, 525 (Tex. App.—Corpus Christi 1990, no writ) (explaining that a parent's lack of judgment, parenting skills, failure to provide adequate nutrition to her children, instructing them to disobey their foster parents, and skip school, are all factors to consider in a parental termination); *Sanchez v. Tex. Dep't of Human Res.*, 581 S.W.2d 260, 265–66 (Tex. Civ. App.—Corpus Christi 1979, no writ) (holding that the parent's poor prognosis regarding her ability to learn to care for her children is a factor to consider in terminating the parent-child relationship).

Evidence at trial established that Mother continued to make poor decisions and failed to place Daniel's needs above her own, even though the Department removed him from her care. Testimony showed that Mother left Daniel in Texas and moved back to Nebraska, making it impossible for her to exercise physical visitation, completely interrupting any continued bonding with her child. Evidence also showed that while Mother substantially completed the remainder of her service plan, the

17

Department employees testified that her decision to move also hindered her ability to demonstrate the parenting skills she may have developed during the completion of her service plan.

While Mother testified that she was living in her own apartment in Nebraska, the apartment had no heat at the time of trial, and Mother failed to give a definitive answer on when heat may be restored. In addition, while Mother testified that she acquired employment in Nebraska, she raised doubt about the stability and longevity of it by surmising it had been interrupted by the government shutdown. Mother stated that if she could not properly care for Daniel, she had a family support system in Nebraska to help her, including her Father, but evidence showed that the Department did not approve her Father for placement because he was recently incarcerated for drug violations. Despite Daniel's removal, Mother continued to display poor decision making and instability that would endanger Daniel if returned to her custody. Her erratic and inconsistent statements regarding unusual and significant events in her life, including her social media postings and her alleged hospitalization while in Nebraska, provided continued concern to the Department about her mental stability and the safety of her son.

Testimony at trial showed that Daniel's foster placement provided stability, that he was happy and content, and his physical and emotional needs were being met

18

because Daniel was meeting developmental milestones. Evidence further established that Daniel loved his foster family and bonded with them, and his foster family indicated they wished to adopt Daniel. We find the evidence both legally and factually sufficient for the trial court to find by clear and convincing evidence that it was in Daniel's best interest to terminate the parent child relationship with Mother. We overrule Mother's second issue.

## Conclusion

Having overruled all of Mother's issues on appeal, we affirm the judgment of the trial court terminating Mother's parent-child relationship to Daniel.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on June 4, 2019
Opinion Delivered July 11, 2019

Before Kreger, Horton and Johnson, JJ.