

**NUMBER 13-15-00107-CV**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI - EDINBURG**

---

**IN THE INTEREST OF T.D.S., T.L.S., C.B.D., AND M.K.D., CHILDREN**

---

**On appeal from the 24th District Court of Jackson County, Texas.**

---

**MEMORANDUM OPINION**

**Before Chief Justice Valdez and Justices Rodriguez and Longoria**
**Memorandum Opinion by Chief Justice Valdez**

Appellant, W.D., appeals the termination of her parental rights to her four children, T.D.S., T.L.S., C.B.D., and M.K.D.[1] By four issues, appellant contends that: (1) the evidence is legally and factually insufficient to support the trial court's finding that she violated three statutory grounds for termination; and (2) the evidence is legally and

---

[1] *See* TEX. R. APP. P. 9.8(b)(2) (providing that in a parental-rights termination case, "the court must, in its opinion, use an alias to refer to a minor, and if necessary to protect the minor's identity, to the minor's parent or other family member").

factually insufficient to support a finding that termination was in the best interest of the children. We affirm.[2]

## I. BACKGROUND

On October 11, 2013, the Department of Family and Protective Services (the "Department"), filed its original petition for protection of a child for conservatorship and for termination in a suit affecting the parent-child relationship in the 24th District Court of Jackson County, Texas requesting to terminate appellant's parental rights to her four children. In an affidavit attached to the petition, the Department's caseworker, Sally Segura stated that the Department received a referral on October 10, 2013, alleging that T.L.S., who was thirteen, had been sexually abused by her stepfather, W.G.D., and that T.D.S, T.L.S.'s brother who was fifteen, had recorded the stepfather having sex with T.L.S.[3] According to Segura, the Jackson County Sheriff's Department viewed the video and found it to be legitimate. The four children were removed from appellant's home. Subsequently, the trial court ordered appellant to comply with a service plan that contained detailed requirements for appellant to complete in order for her to retain custody of the children.

On September 30, 2014, the trial court held a bench trial to determine whether appellant's parental rights should be terminated. After hearing the evidence, the trial court found by clear and convincing evidence that appellant had "knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical

---

[2] W.G.D., the father of M.K.D. and C.B.D., and M.S., the father of T.L.S. and T.D.S., each signed an affidavit of voluntary relinquishment of parental rights prior to trial on termination of appellant's parental rights. The fathers are not parties to this appeal.

[3] For purposes of this memorandum opinion and ease of reading, we will refer to W.G.D., although he is the biological father of M.K.D. and C.B.D., as "the stepfather."

2

or emotional well-being of each of the children," and "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of each of the children." It also found by clear and convincing evidence that it was "in the best interest of [the children] that the parental rights existing between [appellant] and [the children] be terminated." In its written order of termination, the trial court additionally stated that appellant

> failed to comply with the provisions of a court order that specifically established the actions for the mother to obtain the return of the children who [have] been in permanent or temporary managing conservatorship of [the Department] for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children pursuant to § 161.001(b)(1)(O), Texas Family Code.

This appeal followed.

## II.    THE EVIDENCE

The trial court held a hearing on the Department's petition to terminate appellant's parental rights to her four children.[4] At the trial, the trial court admitted the Department's exhibit No. 4, which is a judgment convicting the stepfather for the continuous sexual abuse of T.L.S., a child under fourteen years of age, showing that the stepfather was sentenced to thirty years' incarceration for that offense. The trial court also stated that it was taking judicial notice of "the service plan that is in the file that was filed apparently December 12, 2013" and all its orders in the proceeding.

At the termination trial, Barbara Merek, special crimes officer with the Granada Police Department, testified that she was involved in two separate investigations in 2011

---

[4] At the termination trial, counsel for the Department, counsel for appellant, the children's ad litem attorney, and counsel for interveners, M.K.D. and C.B.D.'s paternal grandparents (the "Grandparents"), were allowed to question the witnesses and present evidence solely on the issue of whether appellant's parental rights should be terminated. The interveners are the stepfather's parents and at the time of the trial had possession of M.K.D. and C.B.D.

and in 2013 of alleged sexual abuse of T.L.S. According to Officer Merek, in January 2011, the police department received a referral from the Department, concerning a report by T.D.S. to school officials that the stepfather had been sexually abusing T.L.S. by bathing with T.L.S. "behind [appellant's back]" and that it had been occurring "for months." When Officer Merek interviewed T.L.S., she denied that there had been any sexual abuse. The case was then closed.

Regarding T.D.S.'s report about the sexual abuse, in the Department's exhibit No. 5, which is a psychological evaluation of appellant conducted by Michelle P. Moran, Ph.D. and admitted into evidence, Dr. Moran documented that appellant told her the following:

> After [T.D.S.] made the outcry of [the alleged] sexual abuse [of T.L.S.] [appellant] spoke with [T.L.S.] about it, and [T.L.S.] had told her that her stepfather had touched her inappropriately. She reported that she took the situation seriously, as she herself had been the victim of sexual abuse in childhood. She reported that she asked for a rape kit to be completed, although it was not, and there was no medical evaluation that confirmed the abuse which [the stepfather] denied.

According to Dr. Moran, the Department's referral information indicated that the stepfather passed a polygraph test and that the investigation "did not validate the allegation [of sexual abuse] at that time." Dr. Moran stated in the evaluation that appellant "construed the situation to be fabrication by her son" due to T.D.S.'s alleged history of lying. Officer Merek testified that appellant believed that T.D.S. was lying because he did not like the stepfather. When asked if it is common for children to lie about sexual abuse, Officer Merek replied that "[i]t's not common" and that the statistics show that only two to five percent of sexual abuse allegations are false. When asked by the children's attorney ad litem on cross-examination if it is "common when a child has not made an outcry for [the child] to deny that any abuse is taking place," Officer Merek replied, "Yes" because

4

the child is not ready to talk about it, and the child has "a lot of fears about different things and retaliation is one of them."

Officer Merek could not "say that [appellant] was protective of [T.D.S.] at any point" and stated,

> I can't recall [appellant] ever being protective. [W]hen she told us I do remember her discrediting [T.D.S.] by saying that he doesn't like [the stepfather], [the stepfather] disciplines him. He's had a problem with [the stepfather] and it's like [s]he was making excuses for why her son would lie about [the stepfather]. Not the fact that, you know, she was concerned about her daughter being molested. She was more concerned about the fact that she got to show that her son is a liar. So I just felt that she's not— not really concerned about her daughter, the allegation about her daughter.

According to Dr. Moran's evaluation, appellant "reported that a second referral was made in 2012, although this investigation also did not confirm the allegations,"[5] and then in October, 2013, after a third outcry, there was "conclusive evidence of sexual abuse" because T.D.S. recorded the abuse on his phone's video camera.

Officer Merek testified that when she investigated the October 2013 allegation, appellant

> was very rude, out of control at one point. Vindictive. She yelled at her children in front of me in a very hateful manner. While we had the children in the police department [appellant] was there with—I don't remember. . . .
>
> [Appellant and two other adults] were in [another portion of the building] and [appellant] kept opening the door while I was trying to talk to the children. Several times she opened the door and I said, [appellant], I need you to stay out while I'm talking to the kids. And she just kept rudely opening the door. At one point she pushed the door open and she yelled at me and the two children who were sitting right there. She pointed at [T.L.S. and T.D.S.] and she said, you can have those two. I'm taking the little ones.

---

[5] Officer Merek's testimony shows that she was unaware of the second incident.

5

Officer Merek stated that at that point she asked appellant and the other two adults to exit the building, and she locked the door "because [appellant] was so disruptive and out of control I really did not feel safe with her being there." Officer Merek went back to her office, which had a window that "that looked out to the front where [appellant] and the other two adults were" and then appellant knocked on the window to get the children's attention and T.D.S. closed the blinds. When asked, "What concern is it that the mother kept barging in and interrupting," Officer Merek responded,

> Intimidation; trying to recant; guilt; fear; all those things. When you have a parent who is not believing and then it's not on the side of the child and being protective or even loving whatsoever.

> I mean, I—it would—just broke my heart that I had to lock her out because of the children, what they heard from their own mother saying I don't want them. You can have them. I just want those two little ones.

When asked, "Have you had any other incidents involving [appellant] while you were investigating the case," Officer Merek said:

> Yeah, but, I mean, I—I can't remember details, just that she's rude. She never believed the children. It was all about [the stepfather]. And I just—I just constantly thought it's so sad for these two children that their mother has taken the [stepfather's] side even after we had the video and we told her we have the evidence. We have proof. We have seen it. We know it's him. He has raped your daughter. It's all there.

> And she didn't want to believe it. She wanted to see the video which we told her we can't show her the video which she did later see the video but it was not in my presence.

In her evaluation of appellant, Dr. Moran documented that appellant told her that the stepfather's sexual abuse of T.L.S. had destroyed the family, that appellant was very concerned for her children's well-being, and that appellant had a melt-down when she realized the allegations were true.

6

Officer Merek did not know whether appellant had visited the stepfather in jail. However, his calls were monitored and recorded in jail, and according to Officer Merek, appellant had spoken with the stepfather approximately thirty times or "probably more." However, Officer Merek was not sure whether those conversations occurred after appellant saw the video.[6] According to Officer Merek, the phone calls were

> [a]bout how she's going to defend him. She's going to stick by his side. We have no evidence. Don't worry. You know, we'll get through this. Those kids lied. Everything that she said was bad about the kids and it was all in support of [the stepfather]. And [the stepfather], his response was never, yeah, I'm innocent. He never said he was innocent. She kept saying I know you're innocent, baby. I know you're innocent. I know you didn't do this, baby. He never once said no, I did. No, I didn't do it or he never did say no I didn't.
>
> . . . .
>
> He never denied it. Never denied it to her. But she just kept insisting to him over the phone conversations that I know you didn't do this. These kids are liars. They have no evidence. They can't prove anything. Don't talk to the cops. Just very much in love and defending him.

Regarding contact with the stepfather, Dr. Moran's report stated that although appellant was supportive of the prosecution of the stepfather, "[s]he has . . . maintained communication with him, initially stating the need to confront him about why he had victimized her daughter." However, according to Dr. Moran, appellant "accepted feedback about the need to cease initiating or returning letters, phone calls, or any other communication with him for her own emotional wellbeing."

Officer Merek testified that "it should have been obvious" to appellant that T.L.S. was being sexually abused, but acknowledged that "[n]ot everybody has common sense."

---

[6] Appellant stated that she saw the video two weeks after the stepfather was arrested on October 21, 2013 and denied that any of these phone calls occurred after she saw the video.

Officer Merek agreed that a mother should be "very" concerned if an adult male was bathing her eight or nine-year-old daughter and that if her husband or boyfriend had been investigated twice for sexual assault of her child, Officer Merek would be concerned "that there might be something behind that." Officer Merek stated that she would "definitely" closely supervise the child in such a situation and keep the two apart "just in case." Officer Merek testified that in her opinion, appellant did not do everything she could have legally done to protect T.L.S.

Barbara Torgusen, a therapist, testified that she does pro bono work at The Harbor Children's Alliance Victims Center in Port Lavaca, Texas and that she had been meeting with T.L.S. and T.D.S. since October 23, 2013 approximately once per week for an hour. Torgusen stated that she became involved after receiving a referral that T.D.S. had recorded T.L.S. being sexually assaulted and that her role was to "[h]elp them adjust to their new normal." Torgusen testified that when T.L.S. started her therapy, "Her hair hung over her face[,] . . . she cried[,] and she was guilt-ridden. . . ." According to Torgusen, T.L.S. felt "completely betrayed and devastated by not only what had happened with [the stepfather] but [also with appellant's] pacification that this was somehow [T.L.S.'s] fault." Regarding T.D.S., Torgusen explained that he was well dressed and calm, but that when they discussed the stepfather's sexual assault of T.L.S., "he was just livid" and

> had such rage that this had happened to his sister, that he was put in a position to have to videotape his sister. That his mom didn't take them seriously, that he was not protected. That he had to do this when it had been brought to his mom's attention already [and that] this is the third time. So there was a lot of betrayal and fear that he was going to have to go back and live with them and a lot of rage.

Torgusen testified that T.L.S. had improved until recently "when apparently [appellant had] made some entry into their lives again." When asked, "What in [sic]

specifically have the kids told you that you feel is important for your working with them," Torgusen responded

> I think one of the most significant things that we have been dealing with is the betrayal of—of [appellant] towards the children. That she loves the younger two children and that they were kind of left on their own to care for the younger children.

> They felt like she was a good mom in public in that she came to the games, she did, you know, whatever was necessary at school but it was as if as soon as they shut the door to going back home that mom disappeared. So we're looking at the betrayal and the anger of what happened. And the no protection. And the fact that they're being blamed.

> And there is this horrible fear I know that [T.L.S.] had when she talked about often that her mom was going to come snatch her from school to the point where she asked me to call the school and make sure that they knew that she wasn't allowed on the grounds. . . . [T.L.S.] was really scared of her mother.

According to Torgusen, T.L.S. and T.D.S. "never want to go back to their mother. That's a fear that they have."

Torgusen testified that T.L.S. and T.D.S. told her that they cared for the younger two boys. Specifically, they told her that they made sure that the younger boys were "changed" and "if they were outside they had to make sure that [the younger boys] were cared for . . . otherwise they could go down to the park or wherever on their own" and "[t]hat [T.L.S. and T.D.S.] did the cooking for them." In addition, T.L.S. "referred to herself as a mini mom, you know. That she felt like she had to do the laundry and the cooking and taking care, basic care of these two small ones." Torgusen stated that the children told her that appellant was home but on the computer, often drinking, fighting with the stepfather, or "having people over." And according to the children, appellant "would stay in the garage and drink and have parties and stuff like that." The children informed Torgusen that there was physical domestic violence in the home, and T.D.S. said "that

9

he really thought that they would kill each other." According to Torgusen, "It was just a volatile situation and [the children] didn't know what—what was going to come out of it day-to-day."

Torgusen read a letter from T.L.S. to appellant into the record. The letter states:

> Mom, I don't know why you believe stupid instead of your own daughter and we have no idea how he passed the polygraph test. I want you to know how bad I'm hurting, mom. I did almost everything you asked and I'm so sorry I disobeyed you. I'm so sorry I let you down. Mama, as a daughter I have failed you. I am truly sorry. I am so sorry. I am so, so sorry. And I can't believe what you said to me that night when we left, mom. You broke my heart. Every night I cry about what you said. I even have nightmares. I understand why you hate me so much. I failed you. I failed you. I love you so much. I love, love, love, love you. But it is still so hard to forgive you after what you said to me and [T.D.S] that night. Mom, if you really loved us you would have believed your kids. And, mom, stupid hits you all the time. Mama, you could have died from some of the— you all's fights. Scared the boys too.

> And if you loved us you would give us our stuff. Mama, I mean all of it. Or our lock boxes. Everything. Everything. Everything. Please, mama. I'm begging you. And if you would our stuff [sic] out of the storage building too, please. Mama, and again I am so, so, so, so sorry I failed you.

> But please give us our stuff too. Us please. You will always be in my heart. We think you're only [doing] this to get the boys back, but I love you. I will send you more letters.

Torgusen testified that T.L.S. said, "the last thing [appellant] said to her was that this is all your fault. You are ruining our family. This is all your fault." When asked the significance of T.L.S. saying that she failed her mother, Torgusen replied

> At one point [T.L.S.] felt like she was the surrogate mom to [the two younger boys]. She also felt like she began to step in as a surrogate for [appellant], that with—with [the stepfather] that somehow instead of sleeping with [appellant] he was now sleeping with [T.L.S.] instead. If she had not told [T.D.S.] and he had not videotaped it this would not be happening. She feels completely guilty and responsible for the destruction of this family.

Torgusen was asked, "Did [T.L.S.] and [T.D.S] ever tell you that they tried to tell their mother what was going on at other times?" Torgusen said,

> Yes. [T.L.S] said that I think it's three years ago now that she—she told her mom [(appellant)] what was going on, that this had started happening when she was 8 years old and that she told her mom and her mom didn't believe her. She felt like she came out to her mom about what happened after there had been an argument in the house. And so [T.L.S.] seemed to believe that her mom didn't believe her because of the timing that this came out to begin with. But she had talked with [T.D.S.] about this and this is how it came out that [T.L.S.] and [T.D.S.] had talked to their mom and said this is what's going on. She didn't believe them. And so I understand that there was an allegation made to CPS at the time but nothing came of it. [Appellant] has mentioned that she didn't know that she could take her daughter for a SANE exam and didn't take her to the doctor because she didn't know that she could. That is her belief and that at least that's what she has expressed.

Torgusen stated that T.D.S. and T.L.S. have expressed that appellant should be in jail with the stepfather because she is "almost equally culpable" and that "they were not protected, that this is something that they're going to have to live with forever and it destroyed their family."

Torgusen also met with appellant twice for "about an hour" each time. According to Torgusen, appellant attended the first session but because she had missed two scheduled appointments without notifying her office, Torgusen sent appellant a termination letter. Appellant attended the second session after receiving the termination letter. However, according to Torgusen, after the second session, appellant decided to terminate the counseling because appellant was moving out of the area and planned on seeing another therapist. Torgusen stated that appellant never expressed any anger toward the stepfather during the therapy sessions and instead expressed anger at the children. Torgusen said that appellant felt that her older children "had conspired to ruin her life and take her boys away from her. She felt victimized because she could not have

11

known that [T.L.S.] was telling the truth because she always told lies and [the stepfather] passed the polygraph."

Torgusen testified that appellant showed no remorse about the situation and no concern for T.L.S.; and, it appeared to Torgusen that appellant blamed the children "for letting this happen" and for "ruining" her life. Torgusen stated that "the overwhelming majority of [parents she works with ask] how did this happen [to my child], what could I have done to prevent it." On cross-examination by appellant's trial counsel, Torgusen explained that although in her experience a parent whose child is removed by the Department may express anger at the Department, "it's not typical for [a parent] to say this is [the child's] fault. . . . If you hadn't done whatever then this wouldn't be happening" and that "typically a parent [would be] more inclined to side with the child to make sure that the child is safe." Torgusen stated that the first time she spoke with appellant in January 2014, appellant "said that her plan was eventually for when [the stepfather] got out of jail in the future for her and the boys and [the stepfather] and probably [T.L.S. and T.D.S.] to all be reunited, you know, with forgiveness and love."[7]

When asked if based on her experience with appellant she would recommend that the children be returned to appellant, Torgusen replied, "Absolutely not." When asked what would happen to the children if they were returned to appellant, Torgusen said, "[T]hat's the worst possible outcome. I think just in the last few weeks I have seen setbacks from both [T.L.S. and T.D.S] when [a couple of months prior to the termination trial, appellant] [showed] up at The Harbor" and approached the children. Torgusen

---

[7] However, Dr. Moran documented in the psychological evaluation performed on January 10, 2014 that appellant "expected no reconciliation with [the stepfather] . . . . [and appellant] agreed to avoid any future contact with him, and has the long-term goal of completing a divorce."

12

explained that appellant claimed she was meeting with someone from the Department; however, the Department was not located at the Harbor. According to Torgusen, appellant violated a court order by showing up at the Harbor and approaching the children and also by approaching the children on another occasion. Torgusen explained that the children did not appreciate appellant's actions. She said that the children told her that they had to "pull away" from appellant when she hugged them and that T.D.S. told Torgusen that he "didn't want anything to do with" appellant. On cross-examination, Torgusen clarified that T.L.S. said "she was trying to get away" from appellant. Torgusen testified that these unannounced visits from appellant

> re-raised a lot of fear and anger and frustration that they're not safe. They're very concerned that no matter what happens she will always pop up kind of like a jack in the box. . . . And that's very disconcerting when you are trying to establish security and safety in the mind of a child who has been so traumatized. . . .

Regarding the harm of allowing appellant to be in the children's lives, Torgusen stated, "I believe it would be completely devastating" and that the therapy sessions would "have to go back to the beginning and start over with dealing with the betrayal, the anger, the—the feelings of not being able to trust the person that's supposed to take care of you and protect you and look after you. . . " and who has not done so. Torgusen believed that any visitation with appellant would be "very harmful to the children." On cross-examination, Torgusen testified that when she asked T.L.S. if she would like to see appellant, T.L.S. "[a]t first said maybe someday in the future in a hundred years." Regarding whether it would be important for T.L.S. to be informed that appellant now believes her and does not blame her for the sexual assault, Torgusen explained it would be "helpful" if that were true. However, Torgusen stated that she had asked the children

13

what if appellant apologized "and they were both very adamant that it wouldn't be true, it would just be more in their words BS. Would just be piled on to make her look good."

During cross-examination, appellant's trial counsel read from appellant's psychological evaluation and asked the following questions:

> Now you do see in the psychological evaluation on Page 13 that Dr. Moran recommended that—that the children—I'm starting in the middle of number six, the middle of that paragraph. That they, being the children, should be advised that their mother has a different view of the situation currently and they should be allowed time to process the shift in her beliefs and the impact it might have on their relationships in the future. . . . Did you find that, Mrs. Torgusen?
>
> . . . .
>
> Do you disagree with that statement?

Torgusen responded, "I do" and explained why as follows:

> The reason that I disagree is when Dr. Moran interviewed [appellant] she was interviewing her to see what her—what her psycho social evaluation was. She has not talked with the children. She does not have a sense of what the impact has been on their life, you know. The lack of sleep, the nightmares, the betrayal, the not being able to get through school, interrupting their friends, having to move to another town. I don't believe when she did the psycho social assessment that that was her methods. I think she thought at some point that it was not as bad as it was portrayed by maybe [appellant].

The children's attorney ad litem asked Torgusen about a questionnaire that appellant completed as part of her therapy with Torgusen. The questionnaire, which the trial court admitted into evidence, shows that when asked what she found significant in the last year, appellant listed the stepfather's arrest first and her hysterectomy second. These are the only two items appellant found significant, and appellant did not list anything regarding her children on the questionnaire that she found significant. In response to "What are your goals for therapy," appellant wrote, "To get my kids back."

14

Torgusen agreed with the children's attorney ad litem that it is "fair to say that [appellant] is more concerned with herself than with her children" and that appellant puts her own needs before her children.

Based on Dr. Moran's evaluation of appellant, Torgusen believed that appellant "[is] egocentric, which means that she sees things from her point of view and is not able at this time to see [it] from other people's perspective." Torgusen agreed with the children's attorney ad litem when she asked, "So in other words, if her children—her daughter is sexually assaulted and her son is forced to film it so that they can get help, she sees how that [a]ffects her but not how it [a]ffects them?" Regarding whether appellant should be allowed access to the children, Torgusen responded that Dr. Moran's evaluation provided that "If there were to be contact between them this should be in a therapeutic family therapy context with a therapist well acquainted with the children" and agreed that the contact should not occur "in the waiting room at The Harbor" or anywhere else. Torgusen stated that she did not believe that appellant had made any progress toward helping her children.

Torgusen acknowledged that her assessment of appellant's behavior was solely based on the two therapy sessions with appellant and acknowledged that Dr. Moran stated, "In contrast to her earlier denial [appellant] now fully accepts that her husband had sexually assaulted her daughter and also takes responsibility for her role in failing to be cognizant of this sooner." On re-questioning, the children's attorney ad litem asked if Torgusen would be surprised that appellant continued visiting the stepfather in jail after completing Dr. Moran's evaluation on January 10, 2014, and Torgusen replied, "No, I wouldn't. She said at our first meeting that she had." The ad litem asked, "Well, that's

15

not agreeing to avoid any future contact [as stated to Dr. Moran]; is it?" Torgusen said, "No, ma'am."

Jill O'Neill, a licensed professional counselor for C.B.D. and M.K.D., testified that she had been their counselor since January of 2014. Initially, O'Neill met with the children once a week individually for about forty-five minutes, but at the time of the termination trial, she saw them together "about every two weeks" for an hour. O'Neill stated that she observed signs that C.B.D. and M.K.D. had been neglected and elaborated that "they don't appear to have been products of a very nurturing environment. . . . I have observed visits with them [and appellant] and they appear to be very detached from her. They don't . . . look to her for support and that's been a concern of mine." Regarding behaviors indicating abuse, O'Neill said, "They have behavior, fluctuating behavior. They have some episodes of withdrawal to where they—they're anxious to ask for help to communicate that they are—they have a lot of difficulty expressing their emotions."

O'Neill explained that she has observed signs of abuse and elaborated as follows: C.B.D. "will be very infantile . . . with the mom. . . . There was one—he is—he's very controlling over [M.K.D.] that he wants to direct him and tell him when to do something right and sometimes in children that are neglect[ed], they have been the caretaker for the other child. And I see that a lot within these two boys." O'Neill testified that C.B.D.'s and M.K.D.'s self-esteem was "very low," and she had not observed much progress with M.K.D. O'Neill stated that C.B.D. had "come a long way" and his self-esteem had improved significantly, but he was "not anywhere" close to where she would have liked him to be. According to O'Neill, low self-esteem is caused by "lack of attachment, lack of safety, instability, [and] stress." O'Neill testified that when she asked the boys what the

16

roles of the members of the family were, the boys responded that appellant was on the computer and that the boys mentioned "[s]ignificant amounts of fighting" between appellant and the stepfather. O'Neill opined that fighting between parents is "a major stressor for a child" and "[i]t doesn't make for a safe environment." On direct examination, the Department's attorney informed O'Neill that T.L.S. was afraid that the stepfather would kill appellant and asked if that would be traumatic to the children. O'Neill replied that it would cause long term trauma. O'Neill stated that the boys told her that there had been repeated verbal abuse in the home, cussing, "just the constant, constant conflict between the parents," and that the verbal abuse could potentially be "more harmful than actual abuse."

O'Neill observed three visits that appellant had with C.B.D. and M.K.D., which she described as "angry." O'Neill explained, appellant "would become very angry. She would leave the room several times. Very, very difficult in the communication skills that she would use to problem solve with various people at the agency." O'Neill stated that appellant had yelled at, cursed, and verbally abused "people in the agency" in front of the boys. O'Neill testified that appellant's behavior is "stressful for them. . . . [T]hese are people that are acting as caregivers for them at this time and . . . she's very confrontive [sic] with them." O'Neill observed that there was a lack of bonding between appellant and the boys. O'Neill stated that on one occasion C.B.D

> was telling [appellant] that [his guardian] disciplined him when [M.K.D.] drove out into the street on his bicycle. And [appellant] . . . became very angry, left the room and before she left the room [C.B.D.] tried to stop her and she ignored him. And when—after she had become argumentative with the workers involved she came back and [C.B.D.] said, mom, I tried to tell you I get in trouble when I tell [M.K.D.] to drive in the street. And so that— that reaction, that immediate reaction in anger was—was completed by him kind of reestablishing what he was trying to say to her.

17

O'Neill testified that both boys have stated that they miss appellant, but that C.B.D. told her that if appellant did not bring him toys, he would not go to the visits. When asked to rate the severity of the abuse in this case, O'Neill replied, "Very severe." O'Neill stated that in her professional opinion, she did not believe that the psychological needs of C.B.D. and M.K.D. had been met. O'Neill explained, "I have history of working with people, with children that are severely abused and neglected and placed in psychiatric facilities and they want to go home. They want to see their mom. They—and what that explains to me is that despite the abuse and despite the neglect they were given their basic needs were met. Their basic emotional and physical, physiological needs were met, and I don't see that in this case."

O'Neill testified that appellant had "sabotaged every support system that has been put in place for these kids." O'Neill explained that the children's grandmother had concerns that the boys had a lot of stressors and behavioral problems, so O'Neill recommended for the grandmother to arrange that the boys get a psychological exam, which the grandmother did. However, appellant cancelled the appointment.[8] O'Neill described the boys' behavioral issues as follows: "They are impulsive at times. When— when I initially began seeing them they were difficult to re-direct. They are physically aggressive towards each other and towards other children at school. And they have a lot of difficulty maintaining on-task behaviors at home and at school." O'Neill did not agree

---

[8] Appellant denied cancelling the appointment and claimed that she merely rescheduled it because it conflicted with her visitation date. Appellant acknowledged that she had no authority to cancel or reschedule the children's medical appointments at that time.

with appellant's cancellation of the psychological exam because O'Neill believed it "would have [been] a jumping off point to start rebuilding these boys' lives and she cancelled it."

On cross-examination, by the interveners' trial counsel, O'Neill emphasized that appellant interfered "[w]ith [the children's relationship with their] grandparents, with the school, with—with the psychologist by cancelling the appointment." O'Neill stated that appellant also called her requesting that O'Neill not prescribe any medication for the boys and that appellant said, "I don't want my boys on any medication." O'Neill had not prescribed any medication for the boys at the time. However, O'Neill indicated that the boys were on medication and that in her opinion it had helped them. On cross-examination by appellant's trial counsel, O'Neill acknowledged that it is not necessarily abusive when a parent does not want his or her children on medication. However, O'Neill said, "But trying to—not trying to find what the source of the behaviors was I would consider that abuse, especially in a situation like this." O'Neill testified that the behavior that C.B.D. and M.K.D. have shown are "common in kids that . . . are neglected" and that is "clear" to her that they were neglected.

O'Neill testified that C.B.D. and M.K.D. have told her that they want to stay in the custody of the Grandparents. O'Neill stated that it would be harmful to C.B.D. and M.K.D. if they were returned to appellant. O'Neill said,

> They would—my concern is that [appellant] has not actively [sought] out supports in the community that would have strengthened her parenting, that would—I'm not aware of any intense counseling that she has received for what this family has been through. And I think when there is abuse and neglect you have to really recognize and acknowledge that and figure out ways to recover from that, and I don't know that that's taken place.

O'Neill believed that it would be harmful to the children's well-being if they were returned to appellant and the neglect continued because "they would continue to not have

19

the supports that they needed and in their basic emotional needs would not be met." When asked whether it would be harmful to the children if the trial court allowed appellant to visit them, O'Neill responded, "I believe so." The judge asked O'Neill whether violence is a learned behavior and what types of behaviors did she see in children who grow up in a home with domestic violence. O'Neill responded that violence is a learned behavior and that children in homes where there is domestic violence will "act out on other kids. They'll act out on other family members, other people that are crucial in their development. They will . . . redirect their anger to those types of people." The judge stated, "You had mentioned . . . that the children were physically aggressive toward other children at school" and asked if that would be an example of the type of behavior children who witnessed domestic violence exhibit. O'Neill replied, "Yes. It is. And in this case I believe it's also directly related with lack of speech and communication for M.K.D. at an early age." The judge said and asked the following: "You said they're impulsive, physically aggressive to others, can't maintain on-task behaviors and are attention seeking. Are there any of those behaviors that are inconsistent with children who are raised in a home where they observe domestic violence?" O'Neill replied, "No. None of those are inconsistent."

On direct examination by the Department, appellant testified that at the time of the trial she was in the process of moving out of her apartment because she could no longer afford the rent and that she was house sitting for an "adopted aunt" for one week. When asked if she had another place to live, appellant replied that was "in the works" and agreed that once the week ended potentially she would not have a home. Appellant stated that she is "in between jobs at the moment" but that she had submitted her applications for

several jobs and been interviewed. Appellant had been unemployed since August 19, 2014.

When asked when she last visited the stepfather in jail, appellant replied that she had visited him "about a week or two ago" and that she had an argument with M.K.D. and C.B.D.'s grandmother while there. Appellant later explained that her

> visits with [the stepfather] were questions of why would you do this, do you realize the damage that you have caused to not just the kids but to his parents and to everybody involved and it was to get answers. And the last visit that I had with him was whenever I found out that he was sentenced to thirty years and him—it was almost as if he was boastful in, oh, I finally did the honorable thing.

Appellant testified that she did not want to reconcile with the stepfather and that her children were "extremely" important to her. Appellant stated that she did not want her parental rights terminated because her children were "her life."

Appellant acknowledged that the trial court ordered her to follow a service plan as set out by the Department; however, appellant claimed that she had completed everything required by the service plan "unless there was something [she] was missing or [she had] overlooked." The Department's trial counsel stated, "Supposed to have a home," and "Supposed to have a job?" Appellant responded, "Well, I had a home for six months, sir" and "I had a job and I was going to school and I was still making visitations and I was still making appointments. . . ." When asked if she had met all the goals listed in the service plan, appellant responded:

> Sir, my understanding the very beginning was that this was not going to be a long, drawn out process. I went out as I had stated at the last time we were at trial, I took our income tax. I went and paid six months on an apartment to find me some time because I was expecting to have my children back and we were going to go from there as a family. And I was told that I was required to maintain a three bedroom home, which I did.

21

Appellant admitted that she had called T.D.S. a liar but denied that she had called T.L.S. a liar. Appellant acknowledged that she had told Officer Merek that she only wanted the two younger children and that Officer Merek could keep T.L.S. and T.D.S. Despite her earlier denial, appellant agreed that she had also called T.L.S. a liar and that what had happened was all T.L.S.'s fault because appellant believed that T.L.S. was "protecting" T.D.S. According to appellant, after the stepfather passed the polygraph test, T.L.S. consistently told her that the stepfather had not sexually abused her and that appellant explained to T.L.S. that if it happened appellant "would believe [T.L.S.] in a heartbeat." When asked why she called T.L.S. a liar even after the police had a video of the sexual abuse, appellant said she did so because she "was still in shock that [the family was] going through this again after doing everything in [her] power the first go around to get the truth one way or another without the shadow of a doubt. . . ." When asked if she attempted to protect T.L.S. after T.D.S. made the first outcry, appellant replied,

> Yes, sir. Any time I left the house she went with me. [The stepfather] wouldn't even walk down the hallway if she was in the bathroom, if she was in her room. And where—the way our house was set up is you walk through the front door. That was the play room. Off to the right is the kitchen. Off to the right of that is the hallway where it was her bedroom, the bathroom, and it was our room and then the boys' room.
>
> . . . .
>
> I did this for about six months and I was calling CPS because we were supposed to have family counseling. We were supposed to have individual counseling. And I'm calling everybody saying, hey, where is this counseling[?] What do I do[?] I called the school and they're like they haven't set anything up yet. I said no, and I've been trying to get ahold of them.

Regarding the second allegation of sexual abuse, appellant testified that she did not take any steps to protect T.L.S. from the stepfather. Appellant acknowledged that

22

she allowed the stepfather to take T.L.S. on an overnight hunting trip alone but stated that she gave T.L.S. permission to go because Segura, the Department's caseworker, told her "[d]on't worry about it," "[l]et them go," and that she was closing the case. Appellant testified that she also allowed the stepfather to take T.L.S. "[i]n June" to a "father/daughter day" at work. Appellant acknowledged that she left T.L.S. in the home with the stepfather but that the other children were also home. Appellant claimed that T.L.S. and T.D.S. never told her that the stepfather was sexually abusing T.L.S.

When asked if the children lied about appellant being on the computer and that T.L.S. and T.D.S. took care of M.K.D. and C.B.D., appellant responded, "I think it was a little bit of an overexaggeration" because the children were mad at her. Appellant explained that when she was on the computer either M.K.D. or C.B.D. would sit on her lap and watch cartoons or movies. Appellant denied that T.L.S. and T.D.S. took care of the two younger boys. Appellant acknowledged that she and the stepfather would yell and cuss at each other in front of the children mainly due to the stepfather's affairs. When asked if the stepfather ever hit her, appellant said, "[Yes, h]e was on two years['] probation" and explained, "[h]e actually shoved me in front of the cops and got put on probation for two years." Appellant said that the stepfather hit her in front of the children and she also hit him in front of the children.

On questioning by her trial counsel, appellant stated that she takes responsibility for what happened to T.L.S. Appellant stated that she recognized that she had domestic violence problems in her marriage and that she attends domestic violence classes. On cross-examination by the intervener's trial counsel, appellant stated that she failed T.L.S. because T.L.S. did not know she could talk to appellant. When asked if she thought it

23

was appropriate to allow the children to witness the domestic violence, appellant responded that she and the stepfather were finding a marriage counselor when the third sexual abuse outcry occurred. On cross-examination by the children's attorney ad litem, appellant testified that prior to the stepfather passing the polygraph test, T.L.S. told her that the stepfather "stuck his thing in her bottom," and that she did not know what to do about it.[9] Appellant later explained that when the stepfather passed the polygraph it meant "[t]hat [her] prayers [were] answered that the truth was known. . . ." and "that the abuse wasn't happening. . . ." After he passed the polygraph, appellant believed the stepfather when he denied sexually abusing T.L.S. and did not believe T.D.S. or T.L.S. Appellant testified that she "truly believed and thought that this was [T.L.S.'s and T.D.S.'s] way of going and living with their dad" and that T.L.S. was "protecting" and "going along with" T.D.S.

Appellant testified that she recognized that there must be a serious problem for the children to have allegedly lied about the sexual abuse but claimed she had no idea how to address the problem. Appellant did not seek counseling for her children at that time and claimed that she believed that the Department was setting up counseling for the family. According to appellant, when the Department failed to set up the counseling, she called "the school."[10]

The following exchange then occurred between the ad litem and appellant:

---

[9] During direct examination by the Department, appellant stated that T.L.S. and T.D.S. "never" talked to her about the sexual abuse. Specifically, appellant said, "[T.L.S.] never came to me on her own or anything like that. It was—this was never exposed until CPS was already involved or the DA was involved or I'm getting a phone call or . . . ."

[10] It is clear that appellant stated that she called someone at the school once the Department failed to set up counseling; however, we are unable to understand the rest of her answer.

24

Q. If [T.L.S.] is lying to you and you tell [the stepfather] to get out of the house and you later find out she's lying to you then . . . you have to apologize to [the stepfather], he has to move back in. But if she's telling you the truth this child is being molested continuously. Which was the safer course here?

A. That's why they put a safety plan in effect. His mom was staying with us.

Q. [Appellant], I'm talking about what you did. Not what they did. You're the mother.

A. I didn't know what to do because I have four—three other kids there too.

Q. None of them are being molested by your husband.

A. But I am looking at the family as a whole.

Q. Well, you should be looking at your daughter who is being molested; right?

A. I'm looking at it as a whole. I didn't know which way to go.

Q. Okay. [Appellant], did [T.L.S.] ever tell you another time that—

A. No.

Q. She never told you another time and you didn't slap her?

A. No.

Q. You are sure about that?

A. Yes.

Q. All right. But given the circumstances then do you really wonder why she didn't come and talk to you anymore?

A. She wasn't talking to me that much in the first place and that's why I was trying to spend that one-on-one time with her very often.

Q. Well, you're saying that you are sorry that she didn't feel like she was able to talk to you. Aren't you sorry you didn't do a better job of protecting your children?

A. I'm sorry that I trusted the wrong person.

Q. [Appellant], you are the parent. Who is responsible here?

A. That's what I'm saying.

Q. Who is responsible?

A. That's what I'm saying. I—

Q. No. Answer my question.

A. I am.

Q. And did you fail in your responsibility?

A. I—that's what I said earlier.

Q. What?

A. That I failed my daughter in protecting her.

Q. You said that you were sorry she couldn't come to you and talk to you.

A. Because if I had known—

Q. You did know. . . .

A. No. If I had known, truly knew without the shadow of a doubt I would have done something.

Q. Why do you have to know beyond a shadow of a doubt? Why can't you just trust your daughter?

A. Because this was my family. There wasn't just one. There was four involved. There is actually six of us involved if you really want to think about it.

Q. You didn't protect [T.L.S.], and that destroyed your whole family; isn't that true?

26

A.      Yeah, it is.

Carol Wilson, the CASA volunteer supervisor for the children, testified that her responsibility in the case was to ensure that the children were in a safe environment and to support them through the trial.  She was also responsible for making a recommendation to the trial court concerning the best interest of the children.  When asked to provide her recommendation, Wilson stated, "These children have suffered a lot, irreparably at the hands of neglect[ful] and abusive parents.  It's in CASA's best interest of the children that the parental rights for all three of these parents be terminated so that they can be adopted and they can begin the healing process."  Regarding why she believed that it was in the children's best interest that appellant's parental rights be terminated, Wilson testified:

> Well, [she has] failed to protect her children.  She's acknowledged that on more than one occasion. She got a service plan.  She hasn't completed or hasn't followed through completely or satisfactorily in that service plan. She doesn't have a stable home.  She doesn't have a stable job.  And I'm not completely—CASA, I being the representative don't feel that she completely accepts responsibility so that she can begin to heal and help the children heal.

On cross-examination, Wilson stated that after observing appellant's interaction with M.K.D. and C.B.D. at the visitations, she did not believe that appellant exhibited good parenting skills and that she did not appropriately "apply the behaviors that you learn of anger management, of redirecting and role modeling."  Wilson explained that appellant had exhibited angry outbursts and that appellant's focus was directed more on the case worker assistant "than it was focused on her children."

Appellant presented testimony from Crystal Eubanks and Erika Mozdzierz. Eubanks, a licensed professional counselor with the crisis center for Matagorda and Wharton County, testified that she has been treating appellant since April 9, 2014

27

because appellant's husband had sexually assaulted T.L.S. Eubanks stated that appellant told her that she believed T.L.S. "[f]rom the very beginning of [the] therapy sessions all the way up to date." Eubanks believed that with continued counseling, appellant would be capable of protecting her children. Eubanks acknowledged that she had not observed appellant with her children and believed that in order "to have a better opinion" concerning whether appellant could protect the children, Eubanks would need to observe appellant's interaction with the children first. Eubanks did not believe that appellant had mastered all of her problems. When asked whether she recognized that appellant may have some problems taking care of the children, she replied, "Right now she is currently unemployed. She doesn't have a place for them to go right now. So there would definitely need to be some things in place before she could be capable of doing that." Eubanks testified that she did not know whether appellant would likely put her children in a dangerous situation in the future. However, Eubanks believed that appellant intends to protect the children and that appellant has the capacity to improve her parenting skills in that regard.

During cross-examination by the Department, Eubanks testified that appellant has taken responsibility for what happened to T.L.S. and told Eubanks that "she should have been more aware basically, that she feels guilty . . . [because] she should have known." Appellant did not tell Eubanks that she called her children liars or that she had initially blamed T.L.S. Appellant did not tell Eubanks that there had been domestic violence in her relationship with the stepfather, and Eubanks agreed that would be something that needed to be addressed prior to the children being returned to appellant. Appellant did not inform Eubanks that the children had been neglected, and Eubanks agreed that was

28

an issue that needed to be addressed also prior to forming an opinion regarding whether the children should be returned or whether appellant's parental rights should be terminated. Eubanks acknowledged that she could not render an opinion regarding termination of appellant's parental rights because she was not privy to all of the information concerning the children such as appellant's interaction with the children or the children's therapist's opinion that it would be harmful for the children to even have visits with the children.

On cross-examination by the children's attorney, Eubanks agreed that "there's a lot of things [appellant] needs to change before [she could] even get to the point of seeing how the relationship with [appellant's] children [could] be repaired." Eubanks stated that she was "not comfortable putting a time frame" on when appellant would be in "good shape to start dealing with her kids." When asked by the Department if Eubanks would be concerned if she learned that appellant had continued to visit the stepfather in jail as recently as three weeks prior to the termination trial, Eubanks said, "Yes."

Mozdzierz, a case worker with the Department, testified that she had been assigned to appellant's case in October 2013. Regarding placement of M.K.D. and C.B.D. with the Grandparents, Mozdzierz stated that she believes that the grandmother "wants to better her parenting and receive support for herself so that she can provide for [them]" and that on her own initiative, the grandmother sought counseling to deal with the fact that her son, the stepfather, had sexually abused T.L.S. Mozdzierz testified that although at first, the grandmother did not believe that the stepfather had sexually assaulted T.L.S., through counseling, "she now can verbalize that she believes the abuse occurred." In comparison to the grandmother's attitude, Mozdzierz explained that

29

appellant's "attitude [during the course of this case] has been that this isn't her fault and that things that have happened is the fault of the Department or other people."

Mozdzierz testified that M.K.D. and C.B.D. have bonded with the Grandparents, who are the interveners in this case. According to Mozdzierz, M.K.D. and C.B.D. love the Grandparents and it would be harmful to them if they were removed from the Grandparents' home. In addition, Mozdzierz stated that O'Neill had testified that M.K.D. and C.B.D. wanted to stay with the Grandparents and that they did not want to go back to appellant. Mozdzierz testified that "all four children would like to remain in their [current] placements."[11] Mozdzierz stated that she is satisfied with placement of the children with the Grandparents with continued counseling and the Grandparents have attempted to better themselves in order to take care of M.K.D. and C.B.D. According to Mozdzierz, if the Department were granted permanent managing conservatorship of M.K.D. and C.B.M., the Department would continue to monitor their placement with the Grandparents to ensure placement was in the best interest of the children prior to any adoption by the Grandparents.

Mozdzierz stated that the Department had concerns about the current placement of M.K.D. and C.B.D. with the Grandparents because it had received information that the grandmother had spanked the two boys, which is against the Department's discipline policy; however, the Department informed the grandmother of the policy, and the grandmother is "receiving counseling to help her better manage the boys' behavior and

---

[11] Specifically, Mozdzierz testified that although T.D.S. has stated that he loves appellant, he "does not want to see [her] or he has not reported to me that he wants to see [her]." Mozdzierz stated that T.D.S. told her about the domestic violence he had witnessed in the home and that T.L.S. told her that she witnessed appellant being choked and "[s]he said one time she was hit with a bat and that [the stepfather] pushed her against a wall and all four children were present at that time."

that will be ongoing."[12]   When asked if she was concerned that M.K.D. and C.B.D. had been placed in the home of the people that raised the stepfather, Mozdzierz replied, "No" and explained that the stepfather "is an adult and I don't think that how [the grandmother or grandfather] raised him is related to his choices in abusing his step daughter."  Upon cross-examination by the ad litem, Mozdzierz agreed that the Grandparents are "both willing to accept responsibility for their actions when they have done something wrong" and that the grandmother has expressed remorse for not believing T.L.S. and T.D.S.

Mozdzierz testified that appellant had not sufficiently completed or complied with her service plan.  Mozdzierz believed that appellant had not satisfactorily completed any of the goals in the service plan.  Specifically, according to Mozdzierz, appellant had not "demonstrate[d] an acceptance of the responsibility of being a parent" based on her observation of appellant's trial testimony.  Mozdzierz elaborated that she believed that appellant "had difficulty accepting that she was responsible for the abuse that occurred to [T.L.S.]."  Mozdzierz took issue with appellant's answer to what she had done wrong as being that she had "trusted the wrong person."  Mozdzierz did not believe that answer showed that appellant had satisfactorily accepted responsibility.  In addition, Mozdzierz did not believe that appellant had satisfactorily completed the goal of learning and using "parenting practices that meet the emotional and developmental needs of her children" based on O'Neill's testimony that appellant had "sabotaged all of the boys' support

_____

[12] Mozdzierz testified that at her visitation with M.K.D. and C.B.D. appellant "checks the children from head to toe for any mark" and then points those marks out to Mozdzierz.  However, Mozdzierz believed that many of the marks were "normal for the children their age."  Mozdzierz stated that sometimes when appellant claims that there are marks on the children, Mozdzierz does not see any marks.  Mozdzierz explained that any marks that she has seen have not concerned her.

31

systems" and "she's exhibited angry behavior, has yelled in front of the boys and has been very hostile in front of the boys."

Regarding whether appellant met the goal of "demonstrat[ing] an ability to provide basic necessities such as food, clothing, shelter, medical care and supervision of her children," Mozdzierz agreed that testimony had established that appellant did not have a job or an apartment. The Department's trial counsel asked whether appellant has achieved the goal of "demonstrat[ing] the ability to provide her children with adequate care and nurturing demonstrating an ability to bond with her children," and Mozdzierz responded that "O'Neill stated that she has not observed [appellant] to be attached or bonded to her children." Mozdzierz testified that, as required by the service plan, appellant had not "demonstrate[d] an ability to be protective of her children so her children will not be at risk of abuse or neglect in the future." The children's attorney ad litem asked, if appellant had made "even minimal progress on her counseling at this point" given that her therapists testified that "there may be things [she] is unaware of," Mozdzierz responded, "No." Mozdzierz believed that appellant "thinks about herself before her children."

When asked why she believed that appellant's parental rights should be terminated, Mozdzierz replied

> Well, at this time [appellant] is unable to provide for the immediate physical needs of her children, including having a house for them and she's unemployed. She has no ability to support them. [Appellant] has not completed her service plan. She has not demonstrated that she's able to meet the emotional needs of her children, and this has been indicated through several instances throughout the case.
>
> The first would be in November of 2013 the Department asked [appellant] to bring us the children's clothing and belongings and she refused and then wanted to bargain with us and said that she would bring

32

their clothing and belongings if a trumpet that [T.D.S.] had at the time was returned to her. And December of 2013 [appellant] posted on her Facebook that [T.L.S.] was molested.

This concerned Mozdzierz because T.L.S. told her that "she feels like people know that she's been sexually abused just by looking at her and that makes her feel very insecure." Mozdzierz stated that she believed that appellant posted the sexual abuse on her Facebook page "out of anger and had complete disregard for her daughter's feelings, and this was on a public social media website."[13] Mozdzierz believed it would be "very detrimental" to the children if they were placed back in a home with appellant because she did not believe appellant "views her children, at least the older two very favorabl[y] and I would be very concerned for their safety" because "her instinct was not to protect them" and to "call them liars."

In addition, Mozdzierz explained some of the concerns as follows:

[T.L.S.] has reported that there's a student at school who watches her and reports back to her mother who happens to be friends with [appellant]. The Department does believe that that was happening because [appellant] has called [T.L.S.'s] placement and has said things like [T.L.S.] has a boyfriend. You know she has a boyfriend. And somebody is giving her that information and that disrupts [T.L.S.'s] school environment as well.

Every month when I visit [T.L.S.] and [T.D.S.] I asked them if they want to see their mother and they have told me no. And I have relayed that information to [appellant]. Knowing that her children don't want to see her, she has called their placement sometimes fifteen to twenty times in a row. She's left a message and [T.L.S.] told me that just hearing her mom's voice gave her chills. And I don't think [appellant] understands how her behavior [a]ffects her children.

---

[13] Appellant admitted that she posted that T.L.S. had been molested on her Facebook page. When asked why, she replied that she did it because the interveners were "telling everybody" that it was T.L.S.'s fault that the stepfather was in jail, so she clarified that the stepfather was in jail for "molesting" her daughter.

Mozdzierz testified that "[appellant] has failed to address the issues of sexual abuse and domestic violence sufficiently which poses a risk to the children's emotional well-being, if they—they're at risk to being exposed to future abuse and neglect. And then again to follow-up both" and that "Barbra Torgusen and Jill O'Neill stated that it would be detrimental to all four children's healing process if there was a continued parent/child relationship with [appellant]."

Regarding why she believed that appellant's remorse was not genuine but that the grandmother's remorse was genuine, Mozdzierz stated that appellant had "never told [her] that she's sorry about what happened to [T.L.S.] or her other children" and that when she talked to the grandmother "on more than one occasion she has became [sic] teary and cried and said that she was wrong in making those statements to [T.L.S. and T.D.S.]."

### III.    APPLICABLE LAW AND STANDARD OF REVIEW

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi 2006, no pet.). Therefore, termination of the parent-child relationship must be supported by clear and convincing evidence. *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005); *In re D.S.P.*, 210 S.W.3d at 778. This intermediate standard falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied);

34

*Porter v. Tex. Dep't of Protective & Regulatory Servs.*, 105 S.W.3d 52, 57 (Tex. App.—Corpus Christi 2003, no pet.).

Before terminating the parent-child relationship, the trial court must find that the parent committed one of the acts prohibited by section 161.001(b)(1)(A–T) of the Texas Family Code and that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(b)(1)(A–T) (West, Westlaw through Ch. 46 2015 R.S.); *id.* § 161.001(b)(2) (West, Westlaw through Ch. 46 2015 R.S.); *In re J.L.*, 163 S.W.3d at 84. A parent violates section 161.001(b)(1) if the parent does, among other things, the following: (1) "knowingly place[s] or knowingly allow[s] the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children," TEX. FAM. CODE ANN. § 161.001(b)(1)(D); (2) "engage[s] in conduct or knowingly place[s] the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children," *id.* § 161.001(b)(1)(E); or (3) fails to "comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the [Department] for not less than nine months as a result of the children's removal from the parents under Chapter 262 for the abuse or neglect of the children," *id.* § 161.001(b)(1)(O).

In reviewing the legal sufficiency of the evidence supporting parental termination, we must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.L.*, 163 S.W.3d at 85 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)); *In re D.S.P.*, 210 S.W.3d at 778. We must assume that the trier of fact

resolved disputed facts in favor of its finding if it was reasonable to do so. *In re J.L.*, 163 S.W.3d at 85. We must also disregard all evidence that a reasonable fact-finder could have disbelieved or found to be incredible. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *In re D.S.P.*, 210 S.W.3d at 778. "If [an appellate court] determines that no reasonable fact-finders could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient." *In re J.F.C.*, 96 S.W.3d at 266.

In a factual sufficiency review, "[w]e must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated a provision of section 161.001(b)(1) and that the termination of the parent's parental rights would be in the best interest of the child." *In re M.C.T.*, 250 S.W.3d 161, 168 (Tex. App.— Fort Worth 2008, no pet.) (citing *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002)). Under this standard, we consider whether the "disputed evidence is such that a reasonable fact[-]finder could not have resolved the disputed evidence in favor of its finding." *In re J.F.C.*, 96 S.W.3d at 266. The evidence is factually insufficient "[i]f, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or conviction. . . ." *Id.*

## IV. DISCUSSION

By her first three issues, appellant contends that the evidence is legally and factually insufficient to prove by clear and convincing evidence that she violated section 161.001(b)(1) of the family code by: (1) knowingly placing or knowingly allowing the children to remain in conditions or surroundings which endangered their physical or

emotional well-being; (2) engaging in conduct or knowingly placing the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children; and (3) failing to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children who were in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the children's removal from her under chapter 262 for abuse or neglect of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O). By her fourth issue, appellant challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that termination is in the children's best interest.

## A.    Violation of Sections 161.001(b)(1)(D), (E), and (O)

Appellant first argues that she did not act knowingly because she was unaware of any endangerment to her children or "even knew that there was a risk for sexual abuse and disregarded that risk." Appellant claims that the fact that she had no reason to believe that the abuse was actually occurring excused her from protecting T.L.S. until she viewed the video and saw the abuse for herself. Appellant also claims that she could not have acted knowingly because she was unaware of the harmful consequences of allowing the children to witness domestic violence.

Sections 161.001(b)(1)(D) and (E) both require a finding of endangerment. *In Interest of E.M.*, __ S.W.3d __, No. 10-14-00313-CV, 2015 WL 3485317, at *6 (Tex. App.—El Paso May 28, 2015, no pet.). To endanger means to expose to loss or injury, to jeopardize. *Id.* (citing *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *Tex. Dep't Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). The specific danger to a child's

37

physical or emotional well-being may be inferred from parental misconduct and does not need to be established as an independent proposition. *Id.*

Under subsection (D), "we look to see if the environment itself poses a danger to the child's physical or emotional well-being." *In re A.B.,* 125 S.W.3d 769, 775 (Tex. App.—Texarkana 2003, pet. denied). Under subsection (E), the evidence must show a "course of conduct" and our analysis "focuses on conduct of either the parent or the persons with whom the parent has placed the children." *In re A.B.,* 125 S.W.3d 769, 776–77 (Tex. App.—Texarkana 2003, pet. denied). "It is beyond question that sexual abuse is conduct that endangers a child's physical or emotional well-being" and "[p]arental knowledge that an actual offense has occurred is not necessary; it is sufficient that the parent was aware of the potential for danger and disregarded that risk." *Id.* Thus, the evidence does not have to show that appellant actually knew that the stepfather was sexually abusing T.L.S., as she argues, but it must show that appellant was aware of the potential for danger of the sexual abuse and disregarded that risk. *See id.* "Evidence of sexual abuse of another child, coupled with a present or future danger to the child in question, is also relevant to determine whether a parent has engaged in an endangering course of conduct, even if the abuse occurred prior to the birth of the subject child." *In re R.W.,* 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet denied).

It is undisputed that the stepfather was convicted for the continuous sexual abuse of T.L.S. and that T.D.S. recorded an incident of the sexual abuse on his phone.[14] The indictment, which the trial court admitted into evidence, alleged that the stepfather had sexually abused T.L.S. from 2007 until 2013 by intentionally or knowingly causing his

---

[14] Appellant testified that the stepfather pleaded guilty and was sentenced to thirty years.

sexual organ to penetrate her anus and sexual organ, by penetrating her sexual organ with his finger, and by touching her breasts.[15] The record also reflects that the judge interviewed T.L.S. off the record in his chambers.

Appellant admitted at trial that after the first outcry, T.L.S. told her that the stepfather had "stuck his thing in her bottom" and that appellant did not believe T.L.S. According to appellant, after this first allegation, she kept the stepfather and T.L.S. apart for "six months" by making sure that when she left the house, she took T.L.S. with her. Thus, although T.L.S. had told her that the stepfather penetrated her anus with his sexual organ, and prior to him allegedly "passing" a polygraph test, appellant continued to live in the home with the stepfather and allowed her children to remain in the home with him. According to appellant, after the stepfather passed the polygraph test and the case was closed, she believed that the children had lied about the sexual abuse and took no further steps concerning the allegations even though appellant acknowledged that there must have been a serious problem for the children to have allegedly lied about sexual abuse. Officer Merek testified that the first police investigation was closed after T.L.S. denied that there had been any sexual abuse.

Regarding the second allegation, Dr. Moran documented that T.L.S. "made an outcry of molestation that occurred in their home when [appellant] was absent" and that T.L.S. "reportedly told" appellant about the sexual abuse, but appellant did not believe her. The case was closed because the allegations could not be confirmed. Appellant testified that after the second allegation, she did not attempt to keep the stepfather and T.L.S. apart and claimed the Department's caseworker told her that it was fine to allow

---

[15] T.L.S. was born in 2000.

39

the stepfather to be alone with T.L.S., and she allowed the stepfather to take T.L.S. on an overnight trip.

After the third instance that the children made an outcry of sexual abuse, appellant again called T.L.S. and T.D.S. liars and blamed T.L.S. for the situation despite that the police told appellant that a video existed that proved the stepfather had sexually abused T.L.S.[16]   Officer Merek testified that after the stepfather was in jail, in recordings of appellant's phone calls to him, she insisted that he was innocent and called the children liars.   In addition, Officer Merek stated that appellant's erratic behavior when she questioned T.D.S. and T.L.S. after the third outcry concerned her because it appeared as if appellant was attempting to intimidate the children or "trying to recant; guilt; fear."[17] According to Torgusen, T.L.S. told her that both she and T.D.S. had informed appellant that the stepfather was sexually abusing her and that the abuse had begun when T.L.S. was eight; however appellant did not believe it.   Torgusen testified that T.L.S. and T.D.S. believed that appellant should also be in jail because she is "almost equally culpable" and that "they were not protected."

Dr. Moran indicated that appellant had been informed of the "need to cease initiating or returning letters, phone calls, or any other communication" with the stepfather and had "accepted" the "feedback."   However, appellant continued to visit the stepfather in prison even after viewing the video of him sexually abusing T.L.S. and admitted that

---

[16] Torgusen believed T.D.S. was "forced to film [the sexual abuse] so that they [could] get help."

[17] Although Officer Merek's statement is not a complete sentence, the trial court could have properly understood that Officer Merek meant that her concern with appellant's behavior was that appellant was attempting to intimidate the children or cause fear or guilt in the children so that they would recant their allegations from the context of the question, which was, "What concern is it that the mother kept barging in and interrupting?"

she had visited him about one week or two weeks prior to the termination trial. According to Torgusen, during her treatment of appellant, appellant never expressed any anger toward the stepfather and instead expressed anger with the children because she felt that T.L.S. and T.D.S. had conspired to ruin her life.

Based on the record evidence that T.L.S. and T.D.S. held appellant just as culpable as the stepfather for the sexual abuse and stated that she should also be in jail, in combination with appellant's above-mentioned behavior and testimony from Torgusen that appellant's reaction of blaming the children and not harboring any anger against the stepfather was unusual, the trial court could have reasonably inferred that T.L.S. felt she had to recant and deny the allegations in order to appease appellant and to allegedly avoid destroying the family or ruining appellant's life.[18] *See In re L.C.*, 145 S.W.3d 790, 797–98 (Tex. App.—Texarkana 2004, no pet.) ("Without the protection of their mother, the children may suffer continued abuse and may feel less inclined to report any abuse."). This inference is further supported by evidence that T.L.S. was afraid of appellant and by T.L.S.'s letter to appellant wherein she stated that she "did almost everything [appellant] asked and [she was] so sorry [that she] disobeyed" appellant and somehow failed and let appellant down. From this, the trial court may have inferred that T.L.S. disobeyed appellant by not denying the allegations after the third outcry.

---

[18] We note that the trial court interviewed T.L.S. and T.D.S. in chambers pursuant to section 153.009(b) of the family code, which allows the judge to "interview the child in chambers to determine the child's wishes as to possession, access, or *any other issue* in the suit affecting the parent-child relationship." Appellant did not file a motion for a record of the in chambers interview of the children. *See* TEX. FAM. CODE ANN. §153.009(f) ("On the motion of a party . . . the court shall cause a record of the interview to be made when the child is 12 years of age or older. A record of the interview shall be part of the record in the case."). *See id.* § 153.009(b) (West, Westlaw through Ch. 46 2015 R.S.) (emphasis added). Thus, it is possible that the children told the judge more details that are not included in the record.

In addition, evidence was presented that the stepfather had hit the other children, that M.K.D. and C.B.D. were severely neglected, which caused serious psychological damage to them, and that appellant and the stepfather engaged in domestic violence in front of all four children. *See In re C.E.K.*, 214 S.W.3d 492, 497 (Tex. App.—Dallas 2006, no pet.) ("Domestic violence, want of self-control and propensity for violence may be considered as evidence of endangerment. If a parent abuses or neglects the other parent or children, that conduct can be used to support a finding of endangerment.") (internal citations omitted). Finally, evidence was presented that appellant failed to comply with the terms of her service plan by, among other things, not securing a place for the children to live and not acquiring a job. *See In re T.N.F.*, 205 S.W.3d 625, 630–31 (Tex. App.—Waco 2006, pet. denied) (explaining that the parents must comply with each requirement of court ordered service plans under section 161.001(b)(1)(O), which does not allow for consideration of excuses regarding the reasons a parent failed to comply with all provisions of the court's order); *In re T.T.*, 228 S.W.3d 312, 319 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (noting that courts in Texas have refused to find that substantial compliance with provisions of court order are adequate to avoid termination finding under subsection (O)); *see also In re D.L.H.*, No. 04-04-00876-CV, 2005 WL 2989329, at *2 (Tex. App.—San Antonio Nov. 9, 2005, no pet.) (mem. op.) (rejecting the parents' arguments that substantial compliance with section 161.001(b)(1)(O) excused their non-compliance).

Accordingly, viewing the evidence in the light most favorable to the verdict, we conclude that there was sufficiently clear and convincing evidence presented allowing a reasonable fact finder to form a firm belief that appellant knowingly placed or allowed her

42

children to remain in conditions or surroundings that endangered their physical or emotional well-being, that appellant knowingly placed the children with a person who engaged in conduct which endangered the physical or emotional well-being of the children, and that appellant violated section 161.001(b)(1)(O) of the family code. *See In re R.W.*, 129 S.W.3d at 742 ("[I]t is beyond question that sexual abuse is conduct that endangers a child's physical or emotional well-being" and that "evidence of sexual abuse of one child is sufficient to support a finding of endangerment with respect to other children."); *In re A.B.*, 125 S.W.3d at 775; *see also In re Tidwell*, 35 S.W.3d 115, 119–20 (Tex. App.—Texarkana 2000, no pet.) ("[I]t is not necessary for [the mother] to have had certain knowledge that one of the [sexual molestation] offenses actually occurred; it is sufficient that she was aware of the potential for danger to the children and disregarded that risk by . . . leaving the children in that environment."); *Rios v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-11-00565-CV, 2012 WL 2989237, at *5 (Tex. App.—Austin July 11, 2012, no pet.) (mem. op.); *In re C.G.*, No. 13-05-063-CV, 2006 WL 220627, at *4 (Tex. App.—Corpus Christi Jan. 26, 2006, no pet.) (mem. op.) ("We may infer that the aggravated sexual assault of a child in the home is conduct which will endanger the physical and emotional well-being of other children in the home who may discover the abuse or may be abused themselves."). Moreover, the disputed evidence on the matter is not so significant that the trial court could not have formed a firm conviction or belief that its finding was true. We conclude that the evidence is legally and factually sufficient to support a conclusion that appellant violated sections 161.00(b)(1)(D), (E), and (O) of the family code. We overrule appellant's first, second, and third issues.

## C.   Best Interest

43

By her final issue, appellant contends that the evidence was legally insufficient to support a finding that termination was in the children's best interest.

When considering whether parental termination is in the child's best interest, the following non-exhaustive list of factors should be considered: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the party seeking custody; (5) the programs available to assist the party seeking custody; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions committed by the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions committed by the parent. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The party seeking parental termination is not required to prove all nine factors. *In re C.H.*, 89 S.W.3d at 27 (providing that these considerations are not exhaustive, "or that *all* such considerations must be proved as a condition precedent to parental termination"); *In re J.R.S.*, 232 S.W.3d 278, 284 (Tex. App—Fort Worth 2007, no pet.) ("These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.").

Although there is a strong presumption that it is in the child's best interest to allow the natural parent to retain custody, when confronted with evidence to the contrary, that presumption disappears. *In re A.I.G.*, 135 S.W.3d 687, 692 (Tex. App.—San Antonio 2003, no pet.). Evidence proving one or more of the statutory grounds for termination may be probative in determining that termination is in the best interest of the child. *In re A.A.A.*, 265 S.W.3d 507, 516 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). A best-

interest analysis may be based on direct evidence, circumstantial evidence, subjective factors, and the totality of the evidence as a whole. *In the Interest of T.N.*, 180 S.W.3d 376, 384 (Tex. App.—Amarillo 2005, no pet.) (citing *In re C.A.J.*, 122 S.W.3d 888, 894 (Tex. App.—Fort Worth 2003, no pet.)). "A parent's unstable lifestyle, lack of income, and lack of a home may also be considered in a determination of a parent's ability to provide for a child's emotional and physical needs and may also threaten the physical well being of the child." *Id.*

Here, there was evidence presented that T.L.S. and T.D.S. did not want to be returned to appellant. T.L.S. stated that she was scared of appellant and did not want to see her. T.D.S. did not want to see appellant, either. The evidence also showed that M.K.D. and C.B.D. wanted to stay with the Grandparents and that C.B.D. said he would not visit appellant if she did not bring him toys.

Concerning the physical and emotional needs of the children now and in the future, the evidence established that while in appellant's care, the children were not protected from the abuse and neglect occurring in the home. The evidence showed T.L.S. had been sexually abused by the stepfather since 2007 until 2013 and that T.D.S. felt that his only recourse to stop the abuse was to record the sexual abuse and show it to authorities. Torgusen stated that returning the children to appellant would be the "worst possible outcome" because even an unannounced visit by appellant "re-raised a lot of fear and anger and frustration that they're not safe." Torgusen stated that it would be completely devastating to T.L.S. and T.D.S. if they were returned to appellant and that any visitation with appellant would be "very harmful" and that appellant had not made any progress in

45

helping the children. O'Neill stated that it would be harmful for the children to continue any visitation with appellant.

Evidence was presented that T.L.S. and T.D.S. took care of M.K.D. and C.B.D. when they lived with appellant and that M.K.D. and C.B.D. had been so neglected by appellant that they had not properly bonded with her. Both M.K.D. and C.B.D. were also developmentally behind, had low self-esteem, and showed signs of severe neglect and abuse. Once the children were removed from appellant's care, the evidence showed that the children's emotional conditions had begun to improve through counseling. Therefore, the trial court could have reasonably inferred that the children's physical needs, now and in the future, were better served by the Department rather than by appellant.

Moreover, there was evidence that appellant failed to complete many of the requirements of the service plan and did not complete any of the goals, which included, among other things, accepting her responsibility for what had happened to T.L.S. and learning and using parenting practices that meet the emotional and developmental needs of her children. The evidence showed that instead of supporting the children, appellant "sabotaged" M.K.D. and C.B.D.'s support systems and consistently blamed T.L.S. and T.D.S. for the stepfather's acts. Thus, the evidence allowed an inference that appellant did not provide for the children's emotional needs while they were in the Department's care.

Regarding the emotional and physical danger to the children now and in the future, there was evidence that appellant was not protective of the children and showed poor judgment and parenting skills. *See In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.) ("[A] parent's inability to provide adequate care for the child, lack of

parenting skills, poor judgment, and repeated instances of immoral conduct may also be considered when looking at best interest") (citing *Garza v. Tex. Dep't. of Human Servs.*, 794 S.W.2d 521, 525 (Tex. App.—Corpus Christi 1990, no writ); *Sanchez v. Tex. Dep't. of Human Res.*, 581 S.W.2d 260, 265-66 (Tex. Civ. App.—Corpus Christi 1979, no writ); *Coleman v. Tex. Dep't. of Pub. Welfare*, 562 S.W.2d 554, 557 (Tex. Civ. App.—Tyler 1978, writ ref'd n.r.e.); *D.F. v. State*, 525 S.W.2d 933, 940 (Tex. Civ. App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.) (op. on reh'g); *Magallon v. State*, 523 S.W.2d 477, 479 (Tex. Civ. App.—Houston [1st Dist.] 1975, no writ)). The evidence showed that appellant's reaction when she was informed of the third outcry and the video evidence of the sexual abuse was unusual in that she was not "concerned" about T.L.S. And, Officer Merek testified that it appeared as if appellant was attempting to discredit T.D.S. and was more concerned about the stepfather. Officer Merek stated that appellant was rude and yelled at the children in a hateful manner telling them that she only wanted M.K.D. and C.B.D. returned and that Officer Merek could keep T.L.S. and T.D.S. The evidence showed that even after the police told appellant that the video proved that the stepfather sexually abused T.L.S., appellant took the stepfather's side and did not want to believe that T.L.S. was telling the truth and insisted on viewing the video herself.

The evidence also showed that even after watching the video on October 21, 2013, of the stepfather sexually assaulting T.L.S, in January of 2014, appellant told Torgusen that her plans were to reunite with the stepfather in love and forgiveness when he was released from jail and that the children would also live with him. In addition, appellant visited the stepfather in jail after he pleaded guilty to the continuous sexual assault of T.L.S. despite evidence that the children's attorney ad litem and others told her to stop

47

visiting the stepfather. Based on the evidence, the trial court was permitted to infer that appellant's future conduct would comport with her prior conduct and that she would not be protective of the children in the future. *See Jordan v. Dossey*, 325 S.W.3d 700, 732 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi 1992, writ denied).

Moreover, the evidence showed that when the children had contact with appellant, each child had negative emotional reactions. T.L.S. had improved significantly, but after appellant violated a court order and had contact with T.L.S., T.L.S. had a setback. T.L.S. was scared of appellant and had a "horrible fear" that appellant would "snatch" her from school someday, and made sure that school officials were aware that appellant was not allowed at her school. T.D.S. and T.L.S. told Torgusen that they "never want to go back to their mom." When appellant visited M.K.D. and C.B.D., she was very "angry" and caused the children stress by cursing and being verbally abusive to others, including their caregivers, in front of the children.

Appellant's parenting ability was severely impeached by the evidence. The evidence mentioned above and other evidence showed that appellant lacked proper parenting skills and apparently did not attempt to make any improvements while in counseling shown through evidence that she missed appointments with Torgusen and failed to inform her new counselor, Eubanks, of the entire situation regarding the children and the stepfather. For example, appellant failed to inform Eubanks that she did not believe T.L.S. about the abuse, had called T.L.S. a liar, and had blamed T.L.S. Instead, Eubanks testified that appellant told her that she believed T.L.S. In addition, appellant had not discussed with Eubanks the domestic violence that the children witnessed and

that the children had been neglected. Eubanks stated that she would be concerned if appellant continued to visit the stepfather, and appellant admitted that she had last visited him in jail one or two weeks prior to the termination trial.

The evidence showed that M.K.D. and C.B.D. had been neglected by appellant and that they appeared to be very detached from her. The boys also told O'Neill that they had witnessed significant amounts of fighting between appellant and the stepfather, which is a major stressor for children and does not make for a safe environment. There was evidence that the abuse of M.K.D. and C.B.D. was "[v]ery severe" and that their psychological needs had not been met when they lived with appellant.

Appellant stated that she wanted the children returned to her because she loved them and wanted them to grow up in the same home. However, appellant had not acquired suitable housing for the children and did not address her future plans for the children other than to say that she wants to move out of the county and state.

The trial court heard ample evidence, which is set out above, of appellant's acts and omissions indicating that the parent-child relationship was not proper. Thus, viewing the evidence in the light most favorable to verdict, we conclude a reasonable trier of fact could have formed a firm belief or conviction that termination was in the children's best interest. *See* Tex. Fam. Code Ann. § 153.002; *In re J.L.*, 163 S.W.3d at 85; *In re D.S.P.*, 210 S.W.3d at 778. And, the disputed evidence on the matter is not so significant that the trial court could not have formed a firm conviction or belief that its finding was true. *See In re J.F.C.*, 96 S.W.3d at 266. We conclude that the evidence was legally and factually sufficient to support a finding that termination of appellant's parental rights is in the best interest of the children. We overrule appellant's final issue.

**V.**      **CONCLUSION**

We affirm the trial court's judgment.

/s/ Rogelio Valdez
ROGELIO VALDEZ
CHIEF JUSTICE

Delivered and filed the
28th day of August, 2015.